ALFRED GANNON

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Mt. Vernon April 5, 1889.*

1. CRIMINAL LAW—*finding a new indictment—to obviate defects in the original.* Where defects are found in an indictment, it is proper to apply to the grand jury, and have that body return a new one, avoiding the defects in the first; and it is no good ground of abatement that the former has not been actually discontinued when the latter is returned.

2. SAME—*reasonable doubt.* In a criminal case, the court, for the prosecution, told the jury to give the prisoner "the benefit of any reasonable doubt arising out of the evidence in the case:" *Held,* that there was no error in confining the reasonable doubt to such as should arise from a consideration of all the evidence.

3. SAME — *inferences and presumptions* — *of instructions in respect thereto.* On a trial for murder, the defendant asked the court to instruct, that "while circumstantial evidence is legal and proper evidence in criminal cases, yet no inferences or presumptions should be indulged in by a jury, that do not, in their minds, necessarily arise from circumstances proved," etc.: *Held,* that the vice of the instruction was the use of the word "necessarily," and that it was properly refused.

4. On a prosecution for murder, where the evidence was circumstantial, the defendant asked the court to instruct the jury as follows : "And if it is possible to account for the death of the deceased upon any reasonable hypothesis other than that of the guilt of the defendant, then it is your duty, as jurymen, to so account for it, and find the defendant not guilty,"—which the court refused, but it was held that the refusal worked no injury to the defendant, because such instruction was substantially embodied in several others.

5. SAME—*twice in jeopardy—requisites of the plea.* A special plea to an indictment of a former jeopardy must show how and in what manner the prisoner was put in jeopardy.

6. SAME—*new trial granted—former conviction no bar.* If a new trial is granted on the defendant's application in a criminal case, the trial will not be a bar to a second trial on the same or an amended indictment.

7. SAME—*calling on defendant before sentence.* While it is the better practice to call upon the defendant to say why he should not be sentenced, yet the omission to do so is no ground for a reversal in any case.

8. SAME—*facts sustaining conviction for murder.* In this case, the evidence, which is chiefly circumstantial, is reviewed by the court, and held sufficient to sustain a verdict of murder against the accused.

9. EVIDENCE — *circumstantial.* Circumstantial evidence is of two kinds, viz.: Certain, or that from which the conclusion in question necessarily follows ; and uncertain, or that from which the conclusion does not necessarily follow, but is probable, only, and is obtained by a process of reasoning.

10. SAME—*in criminal case* — *exclamation of another in presence of accused.* On the trial of one for the alleged murder of his step-son, it appeared that the accused and the boy went away from their home together. On the return of the accused to the house he found his wife's brother there. The two walked away in company, and came upon the dead body of the boy. The accused and his brother-in-law came back together, the latter going into the house and informing his sister that her boy was drowned, whereupon the mother exclaimed : "I knew it, I knew it; my heart has ached for two hours. Oh, Alfred !"—the accused. At this point, the latter, who was lingering behind, but in hearing, dodged into the house and caught his wife, and told her to "hush, not

take on." It was *held,* the exclamation of the mother was admissible in evidence, as giving character to the conduct and the cautionary words of the accused.

11. SAME—*conversation between husband and wife.* While the law will not permit husband and wife to testify as to their confidential communications with each other, yet a third person hearing a conversation between husband and wife may give evidence of it.

12. PRACTICE—*improper remarks of counsel to jury—time to object— bill of exceptions.* If a party desires to assign for error improper remarks of counsel to a jury, against one tried for murder, or the ruling of the court in giving or refusing instructions in regard to such remarks, he must object at the time to the improper utterances, and take an exception, and such objection and exception must be preserved in the bill of exceptions. A copy of counsel's speech is no part of the record.

13. ASSIGNMENT OF ERROR—*of that which is favorable to the party complaining.* A defendant in a criminal case can not assign for error the giving of an instruction more favorable to him than he was entitled to. On the trial of one for murder, the court instructed the jury, for the People, defining voluntary and involuntary manslaughter. The jury found the defendant guilty of murder. It was *held,* that the instruction could have had no injurious effect.

14. INSTRUCTION—*must have some basis in the record.* Instructions must be based upon the evidence, and instructions based upon the supposed remarks of counsel, about which the record is entirely silent, and to which the bill of exceptions makes no reference, will not be considered by this court.

WRIT OF ERROR to the Circuit Court of Fayette county; the Hon. JESSE J. PHILLIPS, Judge, presiding.

Mr. F. M. GUINN, and Messrs. HENRY & FOUKE, for the plaintiff in error:

The want of any notice is a circumstance in favor of innocence. *Clough* v. *State,* 7 Neb. 320; Mills on Circumstantial Evidence, 43.

The court erred in allowing proof of the wife's declarations. When informed that her boy was drowned, she exclaimed, "I knew it, I knew it; my heart has ached for two hours. Oh, Alfred!" His reply was, "Hush, not to take on." As to the improper remarks and utterances of counsel for the prosecu-

tion, see *Combs* v. *State,* 75 Ind. 215; *Cartwright* v. *State,* 16 Texas, 473; *State* v. *King,* 64 Mo. 591; *State* v. *Lee,* 66 id. 165; *Yoe* v. *People,* 49 Ill. 410; *Dickinson* v. *Burke,* 25 Ga. 228.

The court should have instructed the jury to disregard such remarks. *Kennedy* v. *People,* 40 Ill. 488.

The court erred in giving the instruction defining voluntary and involuntary manslaughter. The accused should have been convicted of murder, or acquitted. There was no evidence to support the instruction. *State* v. *Mahly,* Am. Crim. Rep. 183; 58 Mo. 315; *State* v. *Alexander,* 66 id. 148; *Franz* v. *Hilterbrand,* 45 id. 131.

The court erred in giving the third instruction. It is abstruse and argumentative. (*Dunn* v. *People,* 109 Ill. 644.) We do not think, to justify a verdict of not guilty, a doubt must arise out of the evidence. The doubt may arise from a want of evidence.

The court ought not to have put the plaintiff on trial a second time.

Mr. GEORGE HUNT, Attorney General, and Mr. JAMES M. ALBERTS, State's Attorney, for the People:

The two juries have passed upon the evidence. The rule is, not to set aside a verdict unless it is clearly wrong. Bassett's Crim. Pl. and Pr. (2d ed.) 524; Monc. Crim. Law, sec. 9; Wharton's Crim. Pl. and Pr. (8th ed.) 813.

A third person who happens to overhear a confidential communication between a husband and wife, may be examined as to such conversation. Wharton's Crim. Ev. (8th ed.) sec. 398.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

Plaintiff in error was indicted for the murder, on April 5, 1886, of Hansbrough McCaslin in the county of Fayette. The indictment contains two counts. The first count charges the prisoner with having strangled the deceased; the second count charges him with having cast, thrown and pushed the deceased

into a creek or pond of water, whereby he was choked, suffocated and drowned. The trial took place in March, 1888, before the Circuit Court of Fayette County, and resulted in the finding of a verdict of guilty. The jury, by their verdict, fixed the punishment at imprisonment in the penitentiary for a period of twenty years. Judgment was rendered on the verdict, and plaintiff in error prosecutes his writ of error from this court.

It is assigned as error, that the verdict is not sustained by the evidence, which is entirely circumstantial in its character.

The deceased, Hansbrough McCaslin, was a boy, between six and seven years old at the time of his death, and was the child of Ann Gannon, the wife of plaintiff in error. He was familiarly called "Hank," and appears to have been an illegitimate child. On November 1, 1885, plaintiff in error, being then not over twenty-four years of age, married Ann McCaslin, the mother of this boy, who is said by the witnesses to have been between five and six years old at the time of the marriage. Sometime in February, 1886, plaintiff in error, with his wife and her boy, took up his abode in a log house, containing one room, situated about 200 yards east of Ramsey Creek in Fayette county, and in a field of ten or twelve acres of cleared land.

On the morning of April 5, 1886, at half past eight o'clock, plaintiff in error went with the boy from the house down to the creek for the ostensible purpose of fishing, leaving his wife alone at the house. He returned to the house on horseback without the boy at about twelve o'clock, making no inquiry, as to whether his stepson had returned, and no remark as to his absence. There is no living witness, except himself, of what took place between him and the boy, while he was gone. Upon his return he found his wife's brother, Benjamin F. McCaslin, in the house. The latter had arrived on horseback about fifteen or twenty minutes before Gannon's return, had tied his horse to the fence outside of the yard, and was sitting in the room with his sister. Upon coming up, Gannon laughingly asked

his wife, if he could "get dinner and his horse fed." "She told him, that she supposed he could." He and his brother-in-law at once went to the stable with their horses. When they came back into the house, his wife asked him where the fire shovel was, that he had taken away "in the morning with fire to set (on fire) some log heaps that he was burning." He replied, that he had left it at the creek and "told the boy to bring it when he came up." He asked his wife, who was cooking the dinner, if he would have time, before dinner was ready, to go out and mend up some log heaps. She told him that he could go, if he did not stay too long. He then invited his brother-in-law to go with him to see his "corn ground," and they walked out together. They passed two log heaps. McCaslin, who appeared to be uneasy about the non-appearance of his nephew, looked down the creek to see if the boy came. He asked Gannon where he had left the boy, "and he said he left him down below there fishing, and I made the remark 'he hangs on well for a little fellow.'" Gannon then proposed that they go down and see what he was doing.

They crossed the fence at a point about fifty yards from the bank of the creek, went westward towards the bank, and then southward down the creek, about one hundred yards. Gannon remarked: "that creek looks awful, looks almost like a river." They discovered the boy's clothes on the ground. When they were 20 or 30 feet north of the clothes, Gannon said: "there is his clothes on the bank." "He appeared to be somewhat embarrassed over it." They passed about two feet east of the clothes, and southward down the creek 39 feet, as was ascertained by a subsequent measurement. Here they found the lifeless body of the boy in the water.

A tree had fallen into the creek, whose roots projected above the surface of the water. The body, which was totally naked, had been caught in the roots and was supported by them, so that it appeared near the surface, one shoulder being above the water. Gannon asked McCaslin if he could get the body

out, but the latter declined to allow it to be touched, saying that a coroner's inquest must be held. Upon being told this, Gannon shed tears, and remarked that it would kill his wife.

The boy's clothes—pants, waist, shoes, stockings, cap—lay upon the east side of the creek, 12½ feet east of the edge of the water. There was an upper bank, with an abrupt descent therefrom to the sand below, before coming to the water. Two fish hooks had been set. One fish pole had been stuck into the bank at a point directly west of and opposite the clothes. Twenty feet south of this, another fish pole had been stuck into the bank. The shovel was sticking in the upper bank a little below the clothing. The ground was soft and muddy. The water of the creek was muddy, and the current was west of the place where the body was found, the water at that point being comparatively still.

McCaslin and Gannon went back to the house together. As they entered the door, Gannon fell back a little, while McCaslin told his sister, that Hank was drowned. McCaslin says: "What he said was in response, I presume, to what his wife said. I came up on the door-step. * * * I told her that the child was drowned; she says "I knew it, I knew it; my heart has ached for two hours, Oh Alfred," and, at that point he dodged in and caught her and told her to 'hush, not take on.'" McCaslin left Gannon with his wife, and went after two neighbors, Fish and Williams, who were mending a fence at the adjoining farm. Fish and Williams went to the creek, examined the situation and surroundings, took the body from the water, put some of the clothes upon it, carried it to the house, and placed it in the mother's lap. Other neighbors went to the place where the body was found, and made examinations and measurements before sun-down. The house was not visible from the point, where the clothes were found, on account of the timber and brushwood, which intervened. Some 20 or 30 steps away from the clothes, the roof of the house might be seen.

33—127 ILL.

It is in proof, that on a chilly, rainy day in the middle of February, the plaintiff in error drove the boy out of the house. This occurred in the morning about ten o'clock. Gannon and another brother-in-law, named Robert McCaslin, were at work, making boards about 200 yards from the house, but in sight of the door. Gannon made two trips to the house. During one of his absences, the boy was with his uncle; he had on pants and a waist, was bare-headed, and his bare toes protruded from his shoes; he began to shake and shiver, and wanted to go to the house, but wanted his uncle to go with him; he, however, went alone; shortly afterwards he came back to his uncle crying, Gannon standing in the door-way and looking at him; his uncle carried him to Ramsey; he remained there several days, and then Gannon came after him and took him back. Gannon admits, that, on that morning he and his wife had had a quarrel about some other woman. While denying, that he drove the boy out, he says that he told his wife she could leave and take her son and her brother with her, and that the boy went out and down to the place where his uncle was. Several witnesses for the defense testify, that they never witnessed any acts of unkindness on the part of plaintiff in error towards the boy.

Plaintiff in error says, that he left the house with the boy on the morning of the latter's death at about half past eight o'clock; that he stopped to fix two log-heaps; that he may have been at the first log-heap a half an hour or an hour, but can not tell how long he was at the second; that they also stopped to get bait under or near the fence; that the boy was fishing with the north pole and he with the south pole; that he left his' fishing pole at about ten o'clock, and went west along the south side of the fence, mending the fence, pulling the bushes from a slough that passed under the fence, etc.; that he caught his horse, which was in the enclosure with a halter on, and rode him up to the house; that, when he left the fishing-place, the boy was holding the north pole, fishing with it. In view of the

time spent at the log-heaps before ten o'clock, and at the south
fence after ten o'clock, it is apparent that very little time could
have been spent in fishing, according to the account given by
the prisoner of his own movements.

The theory of the defense is, that, after his step-father left
him, the boy took off his clothes and went into the creek, and
was drowned.    To support this theory, testimony was intro-
duced to show that the boy was fond of going into the water.
This testimony consisted mainly of the statements of persons,
who had seen him with his pants rolled up, wading in a ditch
near the railroad track, and in a pond on somebody's premises.

In opposition to the theory of the defense, it was shown by
the prosecution, that, on the morning of April 5, the weather
was cold, there was ice in the sloughs, the snow was melting
off, and the creek was swollen with the spring floods.  Would
a boy be likely to attempt to swim in the water under such cir-
cumstances?   It was further proven by the state, that there
were tracks leading from the place, where the clothes were
found, to the water's edge; that these were shoe tracks, or the
tracks of shod feet; that there were no barefoot tracks from the
clothes to the water; that the ground was soft enough to show
such tracks, if the boy had taken his clothes off and walked
barefooted to the creek; that the heavy imprint of a man's
boot or shoe heels was in the sand near the water's edge, and
near them the imprint of a boy's hand and fingers, with lines
extended therefrom in the sand for about two feet, as though
the boy had been pushed into the water, or had struggled to
get from the water and had been pushed back.

When the body was found, sediment an eighth of an inch
thick had settled over it, except "the point of the shoulder
where it waved out of the water."   This circumstance would
go to show that the body had been in the water some consider-
able time.   The place, where plaintiff in error claims to have
begun mending his fence, after leaving the fishing ground, was
only distant from the fish poles 60 or 70 yards. , He could

have seen the deceased if the latter had gone to the house to
take the shovel at any time between ten o'clock and twelve
o'clock.   He did not go back to the fishing place on the bank
of the angry creek to discover why the boy staid there so long.
The left side of the boy's neck was found to be purple, and
there was a purple place six or seven inches long on the left
thigh.

The medical witnesses, whose testimony is in the record, did
not examine the body, and they base their opinions entirely
upon descriptions of the body as given by others.   It is diffi-
cult to determine from what they say, whether the discolora-
tion was the effect of wounds previously received, or not.   It
would seem to be true, however, that the discoloration, which
proceeds from the natural decay of the body, does not disap-
pear after it comes, and spreads more and covers a larger sur-
face, than does the discoloration that results from a bruise.
Thomas H. Patton, who examined the body on the day it was
found, and saw the purple spots on the thigh and left side of
the neck and part of the jaw, says that these spots on the
cheek or jaw had passed away and could not be detected on
the day when the body was interred.

The prosecution also introduced testimony tending to show
that, on the afternoon of April 5 and on the next day, the
plaintiff in error kept close by the side of his wife, and pre-
vented her from communicating with other persons.   He did
not allow her to be with others unless he was present.   At
night when his wife and another woman lay across the bed,
he lay between them, although there was another bed in the
room.   On the day of the coroner's inquest, he followed his wife
to the part of the yard where the women were gathered, and
kept away from the place where the men had collected together.

The defense introduced evidence to show, that the plaintiff
in error was a peaceable, law-abiding citizen.   The state, how-
ever, proved that he once had a difficulty with an old man,
named Strickland, and struck him; that he also had a diffi-

culty with a man named Dickerson and knocked him down, and was fined for the offense by the police magistrate; that he was indicted and tried for burglary, but was acquitted; that, since his arrest on the charge of murdering his step-son, he escaped from jail and fled to Missouri, where he was re-captured after being shot in the arm by the officers of the law, and that, while on his way from Missouri to Illinois in charge of the officers, he jumped from the train, while it was travelling at the rate of twenty miles per hour, and was again re-captured.

We can not further comment upon the testimony. It is circumstantial, but, after a careful examination of it, we can not say that the verdict is against the weight of it. The jury saw the witnesses and heard them testify. We find nothing to show, that the jury was influenced by prejudice or passion. This is the second trial. Upon the first trial plaintiff in error was found guilty, and his punishment was fixed at fourteen years in the penitentiary. A new trial was granted him, and a second jury have found him guilty and fixed his punishment at a longer period.

It is also assigned as error, that proof was admitted of Mrs. Gannon's exclamation, when she first learned that her son was dead. We think it was properly admitted as explaining the prisoner's language at that time. The State had the right to show what his utterances were, and what his conduct was, at the time of the discovery of the body and immediately thereafter. As soon as he came into the presence of his wife, he dodged into the house and caught her, and told her "to hush, not take on." These words were addressed to her in response to something she said to him, and can not be fully understood without knowing what she said. The command to "hush" was a command to her to refrain from saying what she had begun to give utterance to. The meaning of the command, as showing what he desired to have concealed or unspoken, could only be explained, when considered in connection with the words made use of by her. He told her not to "take on." This ex-

pression was meaningless, unless it could be determined how and in what way she was "taking on," by admitting proof of the words she addressed to her husband. While the law will not permit husband and wife to testify as to their confidential communications with each other, yet a third person, hearing a conversation between husband and wife, may give evidence of it. (*Commonwealth* v. *Griffin*, 110 Mass. 181; Wharton's Crim. Ev. (8th ed.) sec. 398).

The next error assigned is, that one of the counsel for the prosecution was permitted to make improper utterances in his address to the jury, and that certain instructions asked by the defense, which cautioned the jury against the influence of such utterances, were refused by the trial court. There is nothing in the bill of exceptions, or in the record anywhere, to show either what remarks were made by counsel, or that any objection was made to such remarks, or any exception taken thereto. Counsel for the defense have presented us with what they claim to be a copy of the speech made on the trial by one of the attorneys for the prosecution. But we can not consider it, because it is no part of the record. Instructions must be based upon the evidence, and instructions, based upon supposed remarks of counsel, about which the record is entirely silent and to which the bill of exceptions makes no reference, are properly refused.

It is also objected, that the court gave the jury two instructions defining voluntary and involuntary manslaughter. It is not claimed that the definitions are incorrect, but that the instructions were improper because the crime, if crime there was, could be nothing but murder. We fail to perceive how the plaintiff in error was injured in any way by calling the attention of the jury to an offense, less in degree than that with which he was charged. The instructions complained of were rather favorable to him than otherwise. They could not have had any injurious effect upon the minds of the jury, as they found plaintiff in error guilty of murder, and not of manslaughter.

The instruction, given for the prosecution, upon the subject of reasonable doubt, is complained of. This instruction is substantially the same as instruction No. 12, commented upon in *Spies et al.* v. *People*, 122 Ill. 251, and is sustained by that case, and the cases there referred to. The main objection urged against it is, that it tells the jury to give the prisoner "the benefit of any reasonable doubt arising out of the evidence in the case." This conforms to the definition of reasonable doubt already laid down by this court in *May* v. *People*, 60 Ill. 119, where we said: "A reasonable doubt is one arising from a candid and impartial investigation of all the evidence, and such as, in the graver transactions of life, would cause a reasonable and prudent man to hesitate and pause."

The defense asked an instruction, which contained the following words: "And if it is possible to account for the death of the deceased upon any reasonable hypothesis other than that of the guilt of the defendant, then it is your duty, as jurymen, to so account for it, and find the defendant not guilty." The court refused the instruction, and such refusal is claimed to be error. Wharton says, the doctrine that, "to justify a conviction on circumstantial evidence, it is necessary to exclude every possible hypothesis of innocence," is based upon "a series of dicta." (Wharton's Crim. Ev. (8th ed.) sec. 10; *Shultz* v. *The State*, 13 Tex. 401). Wills says: "In order to justify the inference of legal guilt from circumstantial evidence, the existence of the inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt." (Wills on Circum. Ev. p. 149). We do not deem it necessary to the decision of this case to discuss the question. Assuming the principle, announced in the refused instruction, to be correct, we can not say that its refusal worked any injury to the defendant in this case, because it was substantially embodied in several other instructions, which were given for him and at his request.

In one of the instructions given for the defendant, the court said to the jury: "To warrant a conviction of the defendant, he must be proved to be guilty so clearly and conclusively that there is no reasonable theory upon which he can be innocent, when all the evidence in the case is considered together." In another, the court said: "Before a jury will be justified in returning a verdict of guilty, the circumstances so relied upon to justify a conviction must be so strong, pertinent and convincing as to exclude every reasonable doubt of his innocence." In still another the court said: "The jury are instructed that, when circumstances alone are relied upon by the prosecution for a conviction, the circumstances must be such * * * as are reconcilable with no other reasonable hypothesis than that of the defendant's guilt, and must satisfy the mind of the jury of the defendant's guilt beyond a reasonable doubt."

The Court also refused to give for the defendant an instruction to the effect, that, "while circumstantial evidence is legal and proper evidence in criminal cases, yet no inferences or presumptions should be indulged in by a jury, that do not, in their minds, *necessarily* arise from the circumstances proved," etc. There was no error in the refusal. The vice of the instruction consists in the use of the word, "necessarily." The inferences, to be drawn by the jury from the circumstances proved, must be such as to satisfy their minds of the guilt of the defendant beyond any reasonable doubt. The conclusion, that the defendant is guilty beyond a reasonable doubt, may not follow *necessarily* from the proven circumstances, but may be obtained therefrom by probable deduction. Greenleaf says: "Circumstantial evidence is of two kinds, namely, *certain*, or that from which the conclusion in question *necessarily* follows; and *uncertain*, or that from which the conclusion does not necessarily follow, but is *probable* only, and is obtained by process of reasoning." (1 Greenl. on Ev. (14th ed.) sec. 13a.) The conclusion that death has resulted from murder, rather than from accidental drowning, may be reached by a process

of reasoning, so as to leave in the mind no reasonable doubt as to its correctness.

Complaint is made that the defendant was not asked by the court, before judgment and sentence, if he had anything to say why sentence should not be pronounced against him. There is no statute requiring the court to so call upon the defendant. The record in this case contains the following: "Neither defendant nor his counsel having anything further to say why sentence should not be pronounced against him by the court on the verdict of guilty rendered by the jury in this cause, it is therefore ordered," etc. It would appear from this recitation, that the defendant had a chance to speak if he had desired to do so. We disposed of this question, so far as minor felonies are concerned, in *Bressler* v. *People*, 117 Ill. 422.

We are of the opinion, that, while it is a better practice to call upon the defendant to say why he should not be sentenced, yet the omission to do so is no ground for reversal in any case.

Such omission does not affect the verdict, because defendant is never called upon to speak until after verdict.

One of the reasons given for the origin of the practice in England is, that a person on trial for felony was not allowed counsel. Here, the accused always has counsel to represent him.

Another reason assigned in the books for the observance of the practice is, that a motion may be made in arrest of judgment. Under our system, the motion in arrest and the motion for new trial are disposed of before the time for the sentence arrives. In the case at bar, defendant made motions for new trial and in-arrest of judgment, and they were both overruled. It is necessary that the prisoner be present when the verdict is rendered, and that he be present when sentence is pronounced, and if the record shows, as the record in the present case does show, such presence of the prisoner, it is not perceived how his rights are prejudiced by a failure to observe the ceremony contended for. It has been said that the de-

fendant is thereby enabled to lay before the court certain statements, which may have the effect of mitigating his punishment. But, under our statute, the extent of the punishment is fixed by the jury in their verdict, and not by the court at the time of sentence. In quite a number of the States the failure of the record to show the observance of the ceremony has been held not to be ground for a reversal, though it is held that the form is one proper to be used. (Wharton's Crim. Pl. and Pr. (9th ed.) sec. 906; *State* v. *Hoyt,* 47 Conn. 518; *State* v. *Bell,* 27 Mo. 324; *Sarah* v. *The State,* 28 Ga. 576.)

Plaintiff in error also assigns as error, that the trial court erred in refusing to admit the record of the former trial of this case to go to the jury as evidence of former jeopardy. The present record recites, that defendant entered his special plea of former jeopardy, which was demurred to by the State, and the demurrer was sustained. But the plea itself is nowhere set forth in the record now before us, and we have no means of knowing what it was. Such a plea must show how and in what manner the prisoner was put in jeopardy. (Wharton's Crim. Pl. and Pr. sec. 520, 9th ed.)

But, independently of the question of the absence of the plea, the record of the former trial would have been no bar if it had been admitted. It showed that defendant was tried, convicted and his punishment fixed by the verdict at fourteen years in the penitentiary, but it also showed that the verdict was set aside and a new trial granted upon his own motion. If a new trial be granted, on the defendant's application, this is in itself no bar to a second trial on the same, or an amended indictment. (Wharton's Crim. Pl. and Pr. (9th ed.) sec. 435a.) In *State* v. *Blaisdell,* 59 N. H. 328, it was said: "The verdict was set aside, on motion of the respondent, for the misconduct of a juror. The trial was illegal and went for nothing, and the second trial was not a second jeopardy."

After the new trial was granted, and at the February Term, 1888, the case was submitted to another grand jury, who re-

turned a new indictment, and the second trial took place under this new indictment. It is really an amended indictment, and is the same as the one, under which the first trial took place, with the exception of some changes in the phraseology. Plaintiff in error complains, that the court below erred in proceeding to trial under the second indictment, before the first one was disposed of. No error was committed in the respect here indicated. In *Commonwealth* v. *Drew,* 3 Cush. 279, Chief Justice SHAW said: "Where it is found that there is some mistake in an indictment, as a wrong name or addition, or the like, and the grand jury can be again appealed to, as there can be no amendment of an indictment by the court, the proper course is for the grand jury to return a new indictment, avoiding the defects in the first. And it is no good ground of abatement, that the former has not been actually discontinued, when the latter is returned."

The judgment of the Circuit Court is affirmed.

*Judgment affirmed.*