Commonwealth *v.* Senauskas, Appellant.

Argued June 9, 1937. Before KEPHART, C. J., SCHAF-
FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Harold S. Hampson,* for appellant.

*Lemuel B. Schofield,* Assistant District Attorney, with
him *L. C. Eddy,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, October 8, 1937:
The appellant, Joe Senauskas, was indicted for the
murder of Metro Seminuk. Seminuk and his wife Mary
lived in Warren County, Pa. He operated a filling sta-
tion called the "Air Port Inn" on United States High-
way Route No. 6, between Youngsville and Pittsfield
and he also conducted there a small grocery store, and
sold tobacco and beverages and maintained a room for
dancing. About 12:15 a. m. on March 27, 1936, Semi-
nuk, while standing on the driveway beside his gasoline
pump, was shot through the heart, dying almost in-
stantly. He was shot four times. On March 31, 1936,

Senauskas was arrested by the State Police. At the barracks he admitted complicity in the shooting and showed the officers where the revolver was hidden. On April 5, 1936, he made a complete confession in writing. His fingerprints were found on glasses and beer bottles used by him shortly before the shooting at the Air Port Inn. At the time of the homicide his age was 18 years, four months and six days.

In his confession he stated that late in the evening of December 31, 1935, he met at a dance in Corry a man named John Polens who asked him if he knew any "racket people," and specifically, "any killers" in Cleveland. A little later Polens told him whom he wanted killed and why. Polens said he wanted the man killed because he, Polens, had lost possession of a farm through this man, and also because he had "defamed him and put the needles to him," as a result of which Polens, so he claimed, was unable to get a job.[1] A few days later Polens came to see appellant and the latter told him that he had already gotten in touch with the men in Cleveland and that "they would come and do it" but that they wanted part payment first. Polens then gave appellant $50, but, before doing so, he took him to the Air Port Inn and pointed out Seminuk. On March 26, 1936, Polens drove the defendant to Corry to take an automobile operator's test for a license. Polens then suggested to Senauskas that they get a car for the latter "to do the job." They went to Buffalo and rented an automobile. On their return they stopped near Youngsville and Polens produced a revolver and they each "shot into the woods just to see how the gun worked." They then went to Youngsville where Polens bought a half pint of whis-

---

[1] It is a fair inference from the records of the trials of this appellant and Polens that the motive for this homicide had its roots in the relationship between Polens and the wife of Seminuk. Mrs. Seminuk was convicted of murder in the second degree for complicity in the killing of her husband.

key and gave it to Senauskas. He also gave appellant seventeen dollars "to take the car back with and pay for the use of the car" after the designated victim at the Air Port Inn had been killed. Senauskas said that Polens told him "to give him about an hour's time" to get far enough away so that he could have an alibi. Senauskas states that he finished his half pint of whiskey and then went to the Air Port Inn and asked for "John" which was the name by which Polens had designated Seminuk. He was told that "John" was not there. He then left and went to Corry where he drank whiskey and beer. Defendant later went to the Garland Inn and reported to Polens that he had been to the Air Port Inn and that the fellow was not there. Polens told him to "hang around" as the man would be there. He said he drove past the Air Port Inn and then turned around. He stated that the next thing he remembered was when he awoke about 9 a. m., on March 27, 1936. He got into the automobile and went to Garland and made inquiries at Garland as to where Polens lived. The man to whom he made inquiries asked if he, the defendant, was from Warren, remarking that he thought perhaps he had come down to tell Polens "about the shooting they had at the Air Port Inn." This man said that someone had shot a man by the name of Metro. Then defendant stated in his confession: "I got scared and figured I shot the wrong man as the man I was to shoot I knew him as John." He later met Polens, who gave him $30, and assured him that "Metro and John were the same." Polens later handed Senauskas $120 and told him to leave this part of the country.

Senauskas was called for trial on June 2, 1936. He entered a plea of "not guilty." He was represented by Attorney Earle V. MacDonald, now deceased, who had been appointed counsel by the court. On June 2 five jurors had been selected and on the following morning the defendant in open court asked leave to withdraw his plea of "not guilty" and enter a plea of "guilty." This

was granted and the plea entered. The case was continued until June 10, 1936, for the purpose of taking testimony to determine the degree and the sentence.

A hearing was held on June 10th. Defendant's confession and other evidence were received. The presence of Senauskas at the place of the homicide on March 26, 1936, was established by a witness who had talked with him at that place and had left at about 12 o'clock p. m. When the witness reached a point about 150 feet from the Inn, he saw the deceased and Senauskas come out of the door and walk around back of the car. He said the defendant got into the car and that he heard the deceased say, "She is full now," and then he saw him take the gasoline hose, walk behind the car, and hang it up on the pump. The deceased then walked to the left-hand side of the car, and immediately the witness heard "three or four shots in rapid succession and a scream at the same time." Immediately "the car started out very fast, traveling west without any lights." The witness ran back to the Inn and saw Seminuk lying alongside the driveway. He said: "He looked as though he was dead." Another witness also saw the defendant at the Air Port Inn.

The evidence conclusively proved the guilt of Senauskas of murder in the first degree, and on June 23, 1936, in the presence of defendant and his counsel, the court so fixed the degree of murder and imposed the death penalty.

On June 27, 1936, Attorney MacDonald presented to the court a paper entitled, "Motion for New Trial and Arrest of Judgment." Permission was asked to withdraw the plea of guilty. No reason of any kind was assigned to support this request. On June 26, 1936, the day before this motion was presented to Judge ARIRD, Attorney MacDonald presented a petition in the Supreme Court asking leave to withdraw the plea of guilty and for the appointment of another judge to hear the motion for a "new trial." This petition was supported

by affidavits to the effect that the guilty plea had been "coerced" in that it was made in response to a promise by Judge ARIRD that the death penalty would not be imposed. The filing of this petition and the allegations it contained were not made known to Judge ARIRD, but he learned of it later from the public press.

On September 28, 1936, this Court directed JAMES I. BROWNSON, President Judge of the 27th Judicial District, to proceed to Warren County and dispose of the motion filed in the lower court for a new trial, arrest of judgment and permission to withdraw the plea of guilty, and a little later Judge BROWNSON was directed to report to this Court with respect to the allegations in the petition filed here to the effect that the defendant had changed his plea to guilty upon assurances from Judge ARIRD that the death penalty would not be imposed. On August 28, 1936, Attorney MacDonald died, and, on October 6 next, Judge BROWNSON appointed Attorney Harold S. Hampson counsel for Senauskas.

On October 27, 1936, Judge BROWNSON began a hearing which lasted five days. He then reported to the Supreme Court that the allegations in the petition had not been established and that, on the contrary, the evidence clearly "negatived the allegations" of any promises made. The Supreme Court on April 12, 1937, dismissed the petition. On May 7, 1937, an appeal to this court was taken.

There are nine assignments of error. The first assignment is based upon the court's refusal of defendant's motion for a new trial. This assignment is overruled.

The second assignment is as follows: "The court below erred in talking privately with the State Troopers, Deputy Sheriff, Sheriff, and Warden, and in using the information so obtained in determining the degree of guilt of the accused, without affording the accused the right to meet these parties and to be present when they talked concerning him and to cross-examine them regarding their statements." This assignment is based on

the following excerpt from the opinion of the court finding the defendant guilty of murder in the first degree: "Now I have talked with the State Troopers, and also the Deputy Sheriff, the ones that arrested Senauskas, and there was no question in their minds but that Senauskas was acting perfectly natural. I have also talked with the Sheriff and the Warden. Nothing wrong with Senauskas except he was a little nervous." It is important to note that the conversations the judge had with these men related *to the mental condition* of Senauskas, a matter not then nor theretofore raised by appellant or his counsel. The judge's talk with these officers was on a fact not in issue. Therefore, the judgment of guilty of murder in the first degree could not have been based in any measure on any such conversations. The second assignment of error is therefore without merit and is overruled.

The third assignment of error is that "the court below erred in its opinion and finding that the plea of guilty entered by the defendant included the wilful, deliberate and premeditated killing of Metro Seminuk."

While it is *not* true that a plea of guilty of murder means a plea of guilty to a *wilful, deliberate and premeditated murder,* for such a plea leaves open for judicial determination the degree of guilt, all murder being presumed to be of the second degree, it is obvious in reading the opinion of Judge ARIRD in this case that he was familiar with this rule of determination and acted upon it. At the outset he cites the Act of May 14, 1925, P. L. 759, providing, inter alia, as follows: ". . . In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life." The court then proceeded to review the facts of this case as revealed by defendant's confession and by witnesses. In the course of his opinion, the Judge said: "Senauskas used a deadly weapon against a vital part of the body, i. e., a shot passed through the heart of Semi-

nuk. Under such circumstances we have a right to presume that malice and intention existed. Senauskas not only had ample time while sitting in this Inn to deliberate and premeditate, but under his own statements the arrangements between him and Polens had been going on for several days, if not weeks." The conclusion of the court states that "after the examination of witnesses and hearing had in due form of law . . . it is adjudged and determined that the crime and the degree of the crime whereof the said Joe Senauskas . . . is convicted by his own plea of guilty and his confession and testimony taken, is murder in the first degree." The third assignment of error is overruled.

The fourth assignment is that "the court below erred in finding the defendant guilty of murder in the first degree." It is overruled.

The fifth assignment of error is based on the sentence. It is overruled.

The sixth assignment is based on the failure of the judge "to ask the defendant, prior to the imposition of sentence, if he had anything to say why sentence of death should not be pronounced against him." The record shows that after the court announced its decision fixing the degree of murder at first, it asked the defendant, "Have you anything to say why sentence should not be pronounced against you?" Appellant contends that this is error because the question did not contain the words "of death" after the word "sentence."

Blackstone in Vol. 4, page 376, in referring to this traditional inquiry, states that the prisoner should be asked "if he has anything to say why judgment should not be awarded against him." In *Rizzolo v. Com.*, 126 Pa. 54, 17 A. 520, before imposing the death sentence on a defendant convicted of murder in the first degree, the prisoner was called to the bar and asked if he had "anything to say why sentence should not be pronounced against him." This was held sufficient to sustain judgment. In that case the Supreme Court, in an opinion by

Chief Justice PAXSON, said: "As no sentence was possible but that of death we think there was no omission." It is true that now when a man is adjudged guilty of murder in the first degree, there remains a choice of *two possible* sentences to be imposed, these being either death or life imprisonment. However, even under the law as it *now* stands, we think that when a defendant convicted of murder in the first degree is addressed as was the prisoner in the case at bar, the omission of the words "of death" does not constitute reversible error.

The rule of the common law as to the right of the prisoner to be asked whether he had anything to say why judgment should not be awarded against him or, to put it another way, why sentence of death should not be pronounced against him, does not now possess the inflexibility it did in an earlier day. At common law the rule served a purpose that could not be served in any other way. It gave a prisoner in a capital case "an opportunity to allege any ground of arrest, or to plead a pardon, if he had obtained one, or to urge any other legal objection to further proceedings against him": *Schwab v. Berggren,* 143 U. S. 442, 446. Putting this question to the prisoner gave him his last opportunity to speak to some one with power to save him from his impending doom. To deprive him of this last opportunity was a serious invasion of his rights, for at common law the defendant in cases of felony was not accorded the privilege of counsel nor could he take any appeal to a higher court. A sentence of death in Pennsylvania has no such irrevocability about it as it had at common law. Anything Senauskas could have said before sentence was imposed, he could by himself or his counsel have said since with equal effect, either to Judge ARIRD, Judge BROWN-SON, or to this court.

Modern criminal procedure has thus taken away this rule's raison d'etre, and it is an honored maxim of the law that "cessante ratione legis cessat, et ipsa lex." However, the practice of propounding to a prisoner in

a capital case the above stated question has been long followed and since, as Chief Justice GIBSON once said, "forms are deeply seated in the foundations of the law," careful judges will continue to make in such cases this ancient inquiry in unequivocal language. Failure to do so will constitute reversible error only when it is shown that the prisoner has been thereby prejudiced.

In *Hamilton v. Com.*, 16 Pa. 129, 133, the Supreme Court, in an opinion by Chief Justice GIBSON, said: "The premises to found a sentence of death are set forth in 1 Chitty's Crim. Law 720, and the form of the entire record is given in 4 Black. Com. Ap. 1. . . ." In that case the error alleged was "the omission to place upon the record the inquiry made of the prisoner after conviction if he knows or hath anything to say for himself why the Commonwealth ought not to proceed to judgment, etc." This court held that "there is nothing on the docket to show even that the prisoner was present when he was sentenced, except the supplementary memorandum that 'he was present in court during every stage of the trial, from the time of his arraignment up to the time when the sentence was passed by the honorable ELLIS LEWIS, president judge of the court, on him.'" The judgment was reversed and the prisoner discharged. The record in the case at bar presents no such fatal omission.

In *Gannon v. People*, 127 Ill. 507, 21 N. E. 525, the Supreme Court of Illinois held that "while it is a better practice to call upon the defendant to say why he should not be sentenced, yet the omission to do so is no ground for reversal in any case. . . . One of the reasons given for the origin of the practice in England is that . . . a motion may be made in arrest of judgment. Under our system, the motion in arrest and the motion for new trial are disposed of before the time for the sentence arrives." In *Sarah v. State*, 28 Ga. 576, the Supreme Court of Georgia held that the failure to ask the accused "if she had anything to say as to why sentence should not

be pronounced was not such an irregularity as to entitle the accused to a new trial." There Judge LUMPKIN said: "The ancient practice was for the court to call on the prisoner if he or she had anything to say why sentence should not be passed. It originated at a time when prisoners were not allowed the benefit of counsel, and when the court was counsel for the prisoner, so far as to see that he was deprived of no legal right. Besides, the benefit of clergy was also allowed; and at this stage it was claimed." The ruling in that case was upheld in *Steel v. State,* 99 S. E. 305 (Ga.), where the Supreme Court of Georgia, said: "If the defendant had been deprived of any substantial right by failure of the court to ask the question, or had the court refused to hear from the accused or his counsel on some meritorious objection to his passing sentence, another question might be raised. But that is not this case. On the contrary, a motion in arrest of judgment was made in the case. What more could the question, if asked, have accomplished? The law will not require a vain thing to be done, and will not remand a case where no error or injury has been shown."[2] The sixth assignment of error is overruled.

The seventh assignment is based on the refusal of the court to permit the defendant to withdraw his plea of guilty. In *Com. v. Senauskas,* 326 Pa. 69, 191 A. 167, this court, in an opinion by the present Chief Justice,

---

[2] In a letter dated August 17, 1937, the Master of the Crown Office and Registrar of the Court of Criminal Appeal of England, informed the writer that the question herein discussed is invariably asked in England of all prisoners before sentence in capital cases, but there is no statutory requirement that this question must be asked. That official expressed his opinion as follows: "If such an objection was raised it would be brushed aside by the Court of Criminal Appeal because manifestly any substantial point which could be put by a prisoner in the Court of the first instance, could also be put by him on appeal, but of course I speak under correction."

reviewed the question of the alleged "bargain" made by the judge not to impose the death penalty in this case. In the opinion appears the following: "It may be stated generally that for a judge to make a bargain, engagement or promise in advance of the hearing of a case *irrespective of what the evidence might thereafter show the facts to be* and as to what judgment he should render therein, would be judicial misconduct." This court said further: ". . . allegations of such misconduct should be clearly proved to warrant the fastening of discredit upon any judicial officer. In the instant case, as President Judge BROWNSON found, the evidence negatives the existence of any improper conduct on the part of the presiding judge. A host of witnesses supported Judge ARIRD'S assertion that no promise had been made. Indeed, defendant had indicated before the trial that he intended to plead guilty and trust to the leniency of the court. . . . If defendant is aggrieved by the action of the Court . . ., the imposition of the death penalty, the overruling of the motion for a new trial or any other matter, order, decree or judgment, he may take an appeal to this court, the only procedure by which this entire record may be removed here and considered. We will consider at that time all matters connected therewith. The testimony which was heard by President Judge BROWNSON upon the present motion will be considered as part of the record to be reviewed by us."

The burden of proving that Judge ARIRD made any commitment before the plea of guilty was entered, as to the sentence to be imposed, was not sustained. The presumption is that it was not made. Regardless of the presumption in favor of the regularity and propriety of official conduct, the allegation is prima facie incredible, for there was no motive for such a commitment; the evidence then available showed that the Commonwealth was justified in asking for a conviction of the defendant of the highest degree of murder and for the imposition of the extreme penalty.

The only admissible evidence offered to support the burden of proof is the testimony of A. L. Cohen, Polen's attorney, who testified that he said [addressing Judge ARIRD at the time of trial] : "I have just talked to Mr. MacDonald and he has told me he is going to enter a plea. Will you give me the same consideration as you do Mr. MacDonald?" The judge replied, according to Mr. Cohen: "I will give you every consideration; of course, I will give you the consideration I will give Mr. MacDonald or anybody else that comes into this court." Attorney Cohen admitted on cross-examination that Judge ARIRD made him no promises.

Attorney MacDonald, now deceased, made an ex-parte affidavit on June 25, 1936, that on June 3rd, Judge ARIRD sent for him before court opened and promised him on his own volition that "if a plea of guilty was entered [for Senauskas], the penalty would not be the electric chair," and that the plea of guilty that day entered in open court "was upon the advice of deponent as counsel upon the representation of the Court that the sentence would not be, in case of first degree murder being found, the electric chair," and that "he communicated the facts relating to the conversation to A. L. Cohen, Esq., who represented John G. Polens."

Judge ARIRD'S version of what happened is that at 9 : 30 a. m., on the second day of trial, Attorney MacDonald came into his chambers and talked with him in the presence of the court stenographer. The attorney stated that he was nervous and wanted the judge to tell him how to proceed with the case. This the judge refused to do. The attorney then said that his client was "clearly guilty" and that he intended to advise him to plead guilty. To this Judge ARIRD replied that Mr. MacDonald should use his own judgment. "There was no other discussion of any kind." Nothing was said as to the sentence to be imposed. Court was then opened and defendant and his counsel came to the bar. Leave was asked to withdraw the plea of not guilty and to enter a

plea of guilty. The court asked the appellant if he desired to withdraw his plea and enter a plea of guilty "and the defendant himself replied in the affirmative."

The record completely supports Judge BROWNSON's conclusion that the plea of guilty entered in this case was not induced by any promise made by him that the death penalty would not be imposed. This assignment of error is overruled.

The eighth assignment is based upon the alleged error of Judge BROWNSON in receiving testimony that the defendant, previous to trial, had expressed an intention to plead guilty. This assignment is overruled.

The ninth assignment of error is based on the alleged error of the court below in approving the appointment of L. B. Schofield, Esq., as Assistant District Attorney. This assignment requires no discussion and is overruled.

The judgment of the court below is affirmed and the record is remitted so that sentence may be carried out.