## Commonwealth v. Caras. No. 2

*Stanley J. Fehr*, district attorney, and *Bernard M. Goodman*, assistant district attorney, for Commonwealth.

*Charles D. Hogan* and *S. Maxwell Flitter*, for defendant.

BARTHOLD, J., January 29, 1945.—On December 4, 1944, defendant, John Caras, alias John Caragiovanos, was indicted for the murder of Louis Ginople. Defendant was called for trial on December 11, 1944, and having been arraigned entered a plea of "not guilty". Twelve regular and two alternate jurors were

selected and sworn and the case proceeded to trial. On December 15, 1944, after 11 witnesses for the Commonwealth had been examined, defendant in open court withdrew his plea of "not guilty" and entered a plea of "guilty". At the request of the district attorney and counsel for defendant, the trial court sat for the purpose of hearing further testimony, in order to determine the degree of guilt and to fix the penalty in the event the court determined defendant guilty of murder in the first degree. This procedure was adopted under and by virtue of the authority of Commonwealth v. Shawell, 325 Pa. 497, where, in a similar situation, the trial judge determined the degree of the crime, fixed the penalty, and imposed sentence.

After the entry of the guilty plea, the Commonwealth called only one additional witness. The defense rested without calling any witnesses. The trial court took the matter under advisement, and on December 26, 1944, filed an opinion and the following order:

"And now, December 26, 1944, it is ordered that the hearing of testimony, upon the plea of guilty of murder entered by defendant in the above-captioned case, be resumed on the 27th day of December, 1944. At the hearing the district attorney is requested to present all relevant testimony bearing upon the degree of guilt and the penalty to be imposed in the event that the court determines defendant guilty of murder in the first degree. All testimony is to be heard in open court in the presence of defendant and his counsel and defendant will be given the opportunity to meet any adverse testimony against him and to present evidence in his own behalf."

As stated in the opinion of the trial judge, the above order was entered because it was a matter of record that 36 witnesses were subpoenaed by the Commonwealth but only 12 of them had given testimony, and because it was also a matter of record that defendant

had made numerous threats against Louis Ginople and others immediately prior to the shooting in the presence of a number of persons who were not called by either side to give testimony on these important matters. The authority for the order thus entered is The Penal Code of June 24, 1939, P. L. 872, sec. 701, 18 PS §4701, and the decisions of the Supreme Court of Pennsylvania in Commonwealth v. Johnson, 348 Pa. 349, 355, Commonwealth v. Giacobbe, 341 Pa. 187, 196, Commonwealth v. Polens, 327 Pa. 554, 555, Commonwealth v. Zec, 262 Pa. 251, 256, and Commonwealth v. Deitrick, 221 Pa. 7, 14.

Upon the resumption of hearings the district attorney presented all relevant testimony and defendant called numerous character witnesses. The case is now properly before the court under the mandate of The Penal Code of June 24, 1939, supra, to determine the degree of the crime and to fix the penalty at death or imprisonment for life in the event the court determines defendant guilty of murder in the first degree: Commonwealth v. Shawell, supra; Commonwealth v. Polens, supra; Commonwealth v. Johnson, supra.

The first question for consideration is, therefore, the degree of the crime. In determining this question, it is the duty of the court to take into consideration the presumption raised by the law in its humanity, that defendant did not wilfully, deliberately, and premeditatedly take life. Upon a plea of guilty to murder, the presumption is that the crime was murder of the second degree and the burden is upon the Commonwealth to show by the examination of witnesses that it was murder of the first degree. The plea of guilty does not raise it to that degree: Commonwealth v. Morgenthau, 249 Pa. 139; Commonwealth v. Romanic, 311 Pa. 415; Commonwealth v. Senauskas, 327 Pa. 541.

Murder in the first degree is defined as a wilful, deliberate, and premeditated killing. The intention to kill is the essence of the offense.

"Therefore, if an intention to kill exists, it is wilful; if this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is deliberate; and if sufficient time be afforded to enable the mind fully to frame the design to kill, and to select the instrument, or to frame the plan to carry this design into execution, it is premeditated. The law fixes upon no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury, from all the facts and circumstances in the evidence. . . . All murder not of the first degree is necessarily of the second degree, and includes all unlawful killing under circumstances of depravity of heart, and a disposition of mind regardless of social duty; but where no intention to kill exists or can be reasonably and fully inferred. Therefore, in all cases of murder, if no intention to kill can be inferred or collected from the circumstances, the verdict must be murder in the second degree": Commonwealth v. Drum, 58 Pa. 9, 16, 17.

Briefly, the testimony on the hearings was to the following effect:

Defendant, sometime between 10 and 10:35 p.m. on November 10, 1944, at the Ahepa Club located on the third floor of premises 224 Northampton Street, Easton, Pa., shot Louis Ginople through the right arm and right chest with a double-barreled shotgun causing multiple gunshot wounds from which he died on the early morning of November 12, 1944. Three or four days prior to November 10, 1944, the day of the shooting, defendant said to Peter Ginople, brother of Louis Ginople, " 'I have three enemies, your brother, Peter Vlahakis, and you, and I am going to kill all of you' ", and at 2 a.m. on November 10, 1944, made a similar statement to George Vlahakis, brother of Peter Vlahakis. Defendant spent most of the after-

noon of the day of the shooting in the Plaza Restaurant where he was seen to take a number of intoxicating drinks and was later seen around 7:30 p.m. in his coffee shop in the City of Easton. Defendant was then dressed in civilian clothes. He there complained to James Theodorakos that someone had said to him that his mother was intimate with a Turk and that he was a bastard. He then made the following threat: "I am going to Ahepa Club. I am going to kill those bastards." Defendant left and came back around 8 or 8:30 p.m. dressed in a hunting suit and hunting vest filled with shells and armed with a double-barreled shotgun. In the presence of several persons who were then in the coffee shop, defendant made statements to the effect that he was going "to show those rats who say I come from Turkish descent", and took from his hunting vest three shells, stating, "this is for Pete Ginople, this is for Louis Ginople, and this for Peter Vlahakis." When asked why he said these things, he replied, "they have been dishonoring me. Someone came and told me that I was born by Turkish seed . . . and I can't stand that." At or about the same time defendant stated to Reverend Chamis, a priest who came into the coffee shop to post church notices, "I am going hunting. I have three hunts to do. And I will have work for you for two or three days. . . . I will have work for you for three different services. . . . You going to read three days in church. . . . You going to be killed and myself going to be killed." The priest testified that defendant was drunk at the time. One of the patrons of the coffee shop tried to take the gun away from defendant and a witness by the name of Gus Pappas, who also heard these threats, tried to get defendant to settle his differences in the right way, but defendant took his gun and went to the Ahepa Club. Gus Pappas followed him there and appealed to him to leave the club. Defendant refused to go, stat-

ing, "I won't go out until the fellows come up and tell me why they tell me that I was born by Turkish seed." Gus Pappas left the Ahepa Club and returned to the coffee shop. Shortly thereafter defendant also returned, came to Gus Pappas and said, "You tell me to be good boy and I was good boy." Gus Pappas shook hands with him and left. The witness, Gus Pappas, testified that defendant was drunk and that he was drinking at the bar of the Ahepa Club when he followed defendant there. Moses Hanna, James Gotsis, Steven Dimmis, and Louis Permessley were in defendant's coffee shop and saw defendant there during the period between 8 and 9:25 p.m. on November 10, 1944. Steven Dimmis heard defendant say, "I am going to show those rats who say I come from Turkish descent", and also heard defendant say to his brother Chris Caras, "did you hear that, that I come from Turkish descent", to which his brother replied, "don't bother me; leave me alone." Moses Hanna testified that defendant "acted like he used to when he was drunk". James Gotsis testified that he "had drinks" but "couldn't say he was drunk." Steven Dimmis testified, "he was like drunk. He had some drinks. . . . Not very drunk, he had some drinks, you know. . . . He was knowing what he was talking about." James Theodorakos heard defendant say to his brother, "your name Caras but my name is bastard because my mother was [intimate with] Turk", and then saw defendant take a bottle of whisky in his hand and drink three glasses of whisky. Shortly thereafter defendant left the coffee shop, saying, "I am going to Ahepa. I am going to kill those bastards." Around 10 p.m. of the same evening, defendant again returned to the Ahepa Club where he drank some beer. Two of the persons threatened by defendant, namely, Louis Ginople and Peter Vlahakis, were already there. Peter Ginople, the third person threatened by defendant,

came in a little later. When Peter Ginople asked defendant, "How is everything? . . . Did you have any luck, Johnny?" defendant replied, "No, I didn't get anything but I still have time to get a couple of rats." Defendant was still dressed in his hunting outfit and was armed with a shotgun. He walked around a while and then entered the front room of the Ahepa Club where he found Louis Ginople, Peter Vlahakis, Moses Hanna, and William Reilly seated at a table playing cards. Joseph Koury and Robert LeRoy were seated at another table in the front room also playing cards. Peter Ginople had gone to the back room of the club and was playing rummy with several other persons. When defendant entered the front room of the Ahepa Club, he stood back of Louis Ginople facing Peter Vlahakis with the shotgun in his hand. While standing there, defendant said, "I came up to kill a couple of rats." Louis Ginople replied, "There is no rats here. This is your friends." Peter Vlahakis then stated to defendant "that wasn't very nice things for him to say," to which defendant replied, "What do you want me to do, shoot?" Vlahakis answered, "If you want to." Defendant then fired a shot in the direction of Peter Vlahakis, but missed. The shot spread, striking a blackboard and the wall of the room. Three or four seconds later defendant fired a second shot, hitting Louis Ginople. When the two empty shells were later taken from the shotgun it was learned that the first shot was a spread shot and the second shot a pumpkin bullet which had gone through the right arm and the right chest of Louis Ginople and finally imbedded itself in the wall of the room. When the police came they found Louis Ginople lying on the floor of the bar room of the club seriously wounded. Defendant was seated beside Louis Ginople talking with him. Louis Ginople asked defendant why he shot him, to which defendant replied, "I'm sorry, Louis, I'll pay for it." Defendant readily admitted to the police that

he had shot Louis Ginople and gave as his reason for the shooting that Louis Ginople had said that defendant's mother was a whore and had been intimate with all the Turks. Defendant was taken to police headquarters where he again admitted the shooting and asked when they were going to hang him. With respect to defendant's condition, Peter Vlahakis stated that he saw defendant drinking around six o'clock of that evening at the Plaza Restaurant and saw him drink some beer at the Ahepa Club, but he stated further that when defendant got to the Ahepa Club, "he had a little drink, but he wasn't drunk. . . . I could understand him", "there was nothing unusual about his walk". Joseph Koury testified that defendant had been drinking. Peter Ginople testified, "He was anything else but drunk; he is like I am now. He was all right. He knew what he talked . . . he didn't look drunk to me." Some of the police officers testified that he had been drinking but that he talked intelligibly and didn't stagger. Certain other of the police officers testified that defendant negotiated the three flights of stairs leading from the Ahepa Club to the pavement unassisted, that he got into the police car unassisted, and from there he was taken to police headquarters where he answered all routine questions regarding his age, marital status, etc. Office Thomas Carr testified that on the next day, November 11, 1944, outside the county prison, officer Stocker asked Carr how Louis Ginople was getting along. When Carr replied, "Not so well", John Caras said, "I hope I did a good job of it."

Doctor Krausz, defendant's family physician, testified that defendant had been suffering from neurasthenia for a long period of time, that his condition was rendered worse by his drinking habits. When the doctor suggested to defendant that he quit his drinking, defendant replied, "drink gave him more relief than any medicine".

Defendant also called numerous character witnesses, among them county officials, professional and business

men who testified as to defendant's prior good reputation in the community.

Mindful of the presumption in favor of defendant and fully cognizant of the burden cast upon the Commonwealth, the court has no hesitation in arriving at the conclusion that the murder of Louis Ginople by defendant constitutes murder of the first degree. The Commonwealth has met the burden of raising the degree of the crime from murder of the second degree to murder of the first degree. The testimony establishes beyond a reasonable doubt a wilful, deliberate, and premediated killing. The facts reveal an intention to kill rendering it wilful; this intention was accompanied by such circumstances as evidenced a mind fully conscious of its own purpose and design, rendering it deliberate, and sufficient time was afforded to enable the mind fully to frame the design to kill and to select the instrument and frame the plan to carry this design into execution, rendering it premediated. There is abundant evidence that defendant was not in such a state of intoxication as to be incapable of conceiving any intent to kill, and unless defendant was in such a state of intoxication his voluntary intoxication would be no excuse: Commonwealth v. Detweiler, 229 Pa. 304; Commonwealth v. Meyers, 290 Pa. 573; Commonwealth v. Lehman, 309 Pa. 486.

The court is satisfied that the testimony conclusively establishes defendant's capability of conceiving the intent to kill in spite of the fact that he had been indulging in the use of intoxicants. His statements and actions both before and after the commission of the offense indicate a design and purpose to carry out the threats theretofore made by defendant. Defendant knew what he was doing both before and after the commission of the crime and was even cognizant of the penalty which might be meted out to him.

For the reasons herein given, the court finds defendant guilty of murder of the first degree.

The next question for the determination of the court concerns the penalty to be inflicted.

Under The Penal Code of June 24, 1939, P. L. 872, sec. 701, 18 PS §4701, the law recognizes two classes of first degree murder, one punishable by death and the other punishable by life imprisonment. In cases of pleas of guilty where the court determines the crime to be murder of the first degree, the law gives to the court discretionary power to impose sentence of death or imprisonment for life. The act does not provide a standard for the exercise of this discretion. No fixed or arbitrary standard can be provided for the exercise of this discretion in all cases. The decision as to which penalty better fits the particular crime depends upon the facts and circumstances of each case, and must be left to the sound discretion of the court: Commonwealth v. Irelan, 341 Pa. 43, 47; Commonwealth v. Hawk, 328 Pa. 417, 418.

While no fixed or arbitrary standards can be provided for the exercise of the discretionary power vested in the court, there are certain general principles enumerated by the Supreme Court which delineate what is and what is not a proper exercise of discretion in cases of this kind. They are as follows:

"The alternate penalties of death and life imprisonment are provided, not with the idea that the courts may impose the one or the other arbitrarily or without reason upon a conviction of first-degree murder": Commonwealth v. Sterling et al., 314 Pa. 76, 78.

"The Legislature, in its wisdom and mercy, recognized that murder of the first degree should not always be punished by death. When sufficient mitigating circumstances are present, the punishment should not exceed life imprisonment": Commonwealth v. Irelan, supra.

"In sentencing prisoners, wise judges invariably consider elements in mitigation and extenuation": Commonwealth v. Stabinsky, 313 Pa. 231, 238.

The mitigating circumstances to be considered are those "which indicate provocation, impulse of emotion, or other satisfactory reasons for lessening the penalty": Commonwealth v. Harris et al., 314 Pa. 81, 85.

The court should consider the facts of the crime, defendant's background, and the extent to which defendant's mental responsibility is diminished: Commonwealth v. Hawk, supra; Commonwealth v. Garramone, 307 Pa. 507, 514.

The facts of the instant case when considered in the light of the above legal principles impel the conclusion that in the exercise of a sound discretion the death penalty should not be imposed. The facts reveal elements in mitigation and extenuation of the kind and character which the Supreme Court has decided should limit the punishment to life imprisonment.

Defendant's record is that of a man suffering from a nervous disorder accentuated by the excessive use of strong drink, whose finer sensibilities were weakened to such an extent that he was unable to withstand the aspersions cast upon the character of his mother and himself. These aspersions aroused in him the emotions of anger and resentment which later caused him to commit the awful crime for which he afterward said he was sorry. These mitigating and extenuating circumstances do not in the slightest degree justify or excuse the commission of the murder, but, under the decisions of the highest court of this State, they do call for the tempering of the penalty.

One other element bearing upon the question of the penalty to be imposed warrants consideration. It is a matter of record that the learned assistant district attorney in his opening address to the jury asked for a first degree conviction but did not state the penalty sought by the Commonwealth. The learned district attorney, as was his right and duty, has stated to the court that the Commonwealth does not seek the death penalty but recommends life imprisonment as the appropriate punishment. Undoubtedly the district attor-

ney was motivated in making this recommendation by the same mitigating and extenuating circumstances which move the court to fix the penalty at life imprisonment rather than death. While, of course, the responsibility for fixing the penalty cannot be shifted from the court to the district attorney and the recommendation is merely advisory, it is but natural that a judge "would and should hesitate to impose a more severe penalty than that asked by the Commonwealth as represented by the public prosecutor": Commonwealth v. Ward, 17 D. & C. 605, 610.

It is the considered judgment of this court, from a study and analysis of the testimony in the present case, including a history of defendant and all the circumstances leading up to and following the commission of the crime, that a proper and adequate penalty is life imprisonment. The imposition of this penalty will fully protect society, will adequately punish the offender, and likewise serve as a deterrence to others. The court therefore adjudges defendant to be guilty of murder of the first degree and fixes the penalty to be imposed upon him as imprisonment for and during the term of his natural life.

---

We, the undersigned, being the two other judges of the court, state for the record that Judge Barthold submitted to us the within opinion, after it was prepared by him, along with a copy of the notes of testimony requesting us to read the record and check his conclusions. This we have done and hereby express our concurrence with the conclusions reached. In doing so, we do not want it to be understood that we had any part in the decision. We have merely expressed our sentiments upon the subject, following the procedure sanctioned by the Supreme Court in the case of Commonwealth v. Shawell, 325 Pa. 497, 507.

H. F. LAUB, *P. J.*
W. A. FRACK, *J.*