(No. 52794.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. DICKIE GAINES, Appellant.

*Opinion filed December 4, 1981.—Rehearing
denied January 29, 1982.*

GOLDENHERSH, C.J., concurring.
CLARK and SIMON, JJ., dissenting.

Carl M. Walsh and Lonny Ben Ogus, of Chicago, for appellant.

Tyrone Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Melbourne A. Noel, Jr., and Mark L. Rotert, Assistant Attorneys General, of Chicago, and Marcia B. Orr and Joan S. Cherry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Dickie Gaines, and his brother, Michael Gaines, were jointly indicted by the grand jury of Cook County for the murder of Andre Davis, the murder of

Causia McCall, the attempted murder of Lenious Thomas, the armed robbery of Davis, and the armed robbery of Thomas. These felonies were all committed in a single criminal episode which took place in the early morning hours of December 22, 1978, at a house on the south side of Chicago. The indictment charged that a handgun had been used in the commission of the offenses, and thus the accused were also charged with armed violence.

A motion by the defendant for severance was granted, and he was tried by a jury, which found him guilty on all charges. (Michael Gaines was tried before a separate jury, was found guilty except for the robbery of Davis, and was sentenced to imprisonment. His appeal is now pending in the appellate court.) In Dickie Gaines' trial the State requested a separate sentencing proceeding, which was heard by the same jury. The jury determined that there were no mitigating factors sufficient to preclude the imposition of the death sentence. On November 2, 1979, the court sentenced the defendant to death on his convictions of murder. The court directed that the sentence be carried out on January 28, 1980, and that the defendant be imprisoned in the penitentiary until that time. An appeal to this court was automatically perfected pursuant to article VI, section 4(b), of the 1970 Illinois Constitution and Rule 603 (73 Ill. 2d R. 603). The trial court stayed the execution pending this appeal.

The circumstances of the crimes were testified to by Thomas, who was called as a witness by the State. The defendant did not testify and offered no evidence at the trial. Michael Gaines was not called as a witness by either party. Except with respect to the charges of armed robbery of Thomas and Davis no claim is made that the defendant's guilt was not proved beyond a reasonable doubt.

On the afternoon of December 21, 1978, Davis was visiting Thomas at the house where Thomas lived with his parents. Thomas was then 17 years old, and Davis was 24.

At about 4 p.m. Davis and Thomas left the house. After visiting and having dinner with a girl friend of Davis, whose name Thomas did not know, the two men went to a tavern in Chicago, where they arrived about midnight. Davis began to shoot pool with an acquaintance named Allen Thompson while Thomas watched the game from a seat at the bar. Davis and Thompson bet money on the outcome of each game, and Thompson testified that he had won $175. In the course of the evening Thomas made the acquaintance of Michael Gaines, whom he had never met before, and at one point Thomas shared with Michael a marijuana cigarette which Thomas had just obtained from Davis.

At about 2 a.m. on December 22, the tavern's closing hour, Thomas, Davis, and Michael Gaines left in a group. As they went out the door they were joined by the defendant. The latter had also been present in the bar, but Thomas, who had never met him before, had had no conversation with him.

The group proceeded to a two-story house where Davis said he wanted to pick up some clothes that belonged to him. Davis' mother, Mrs. Gloria McCall, who was called as a witness for the limited purpose of establishing that Davis had been seen alive shortly before December 22, testified that Davis had been spending his weekends at this house since October. Thomas had never been at the house before.

Davis and Thomas went up to a bedroom at the back of the second floor where they saw a man asleep on a mattress laid on the floor. This man, whom Thomas did not know, was wearing a pair of boots which Davis said were his. After an unsuccessful attempt to awaken the sleeper, Davis removed the boots and then, removing his own shoes as well, put on the boots. Thomas and Davis, who was carrying his shoes in one hand, then walked into an adjacent bedroom where they saw another man asleep on a couch. This man, who was also unknown to Thomas, was later identified as Causia McCall. Davis walked over to the

couch while Thomas remained standing near the door.

The whereabouts of the defendant and his brother up to this point are not made clear by Thomas' testimony, but it appears that they had entered the house along with Davis and Thomas and had also ascended to the second floor. While Thomas and Davis were in the room where McCall lay sleeping, the defendant and Michael came up to the door, and the defendant said, "This is a stick up," producing a pistol. Thomas, who was standing about three or four feet from the defendant, pulled two dollar bills from his pocket, and turned toward the defendant, who began to fire his gun. Thomas was not struck by a bullet, but he threw himself to the floor in a prone position. He heard several shots fired, and then, hearing footsteps which he took to be those of persons leaving the room, he got up and saw Davis lying on the floor. Thomas then ran out of the house and down the street. He encountered a police squad car, and told the officers that there had been a shooting. Thomas guided the officers to the house, where they found two bodies lying on a couch in one upstairs bedroom. In another bedroom at the rear of the house the officers also found a man who was asleep. Upon being awakened, he gave his name as Townshend. Townshend was not called to testify.

After the defendant was apprehended and arrested on January 2, 1979, Thomas identified him in a police lineup. In autopsies performed on McCall and Davis one bullet was recovered from McCall's body and two bullets from Davis'. There was expert testimony that in each case death had resulted from gunshot wounds. Expert testimony was also given that the bullets recovered from the bodies of Davis and McCall could only have been fired by a pistol which had been found by police in an attic in the defendant's house.

At the sentencing hearing the State presented evidence of conduct by the defendant which had not been brought out at the trial as additional aggravating factors. As testified

to by the victim, in March 1976 the defendant and two other persons took a purse from a school teacher while she was walking from a mobile classroom to another school building, and knocked her to the ground. The victim was five months pregnant at the time. On May 5, 1977, the defendant was found guilty of robbery, and was sentenced to imprisonment for a term of not less than one and not more than three years. It appears that he was released in June 1978, six months before he committed the crimes involved in the present appeal. There was also testimony by two women friends of the defendant that prior to his apprehension he threatened to kill or injure them if they did not give him money. Two deputy sheriffs assigned to escort the defendant between the lockup and the courtroom testified that on two occasions the defendant had threatened them and that on another occasion they had found concealed on his person a steel pick, two hacksaw blades, and a $10 bill.

The defendant did not take the stand at the penalty hearing, and he called no witnesses to rebut the State's evidence in aggravation or to testify to any mitigating factors.

The defendant puts forward some 18 grounds for reversal. These include charges that section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1), sometimes referred to herein as "the Act," violates the Constitution of the United States and the Constitution of Illinois in various respects, and alleged errors at the trial and at the sentencing hearing. We begin with a consideration of those contentions directed against the proceedings which led to the defendant's conviction, the first of which is that the jury was improperly selected.

The defendant contends that several veniremen were excused for cause in violation of the criteria specified in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. In *Witherspoon* the Supreme Court, although holding that a potential juror's opposition to the

death penalty did not disqualify him, stated:

"We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*." (Emphasis in original.) 391 U.S. 510, 522-23 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21.

This delineation of the permissible bases for excluding a juror was adhered to in *Boulden v. Holman* (1969), 394 U.S. 478, 482, 22 L. Ed. 2d 433, 437-38, 89 S. Ct. 1138, 1140-41, *Maxwell v. Bishop* (1970), 398 U.S. 262, 265, 26 L. Ed. 2d 221, 224, 90 S. Ct. 1578, 1580-81, *Davis v. Georgia* (1976), 429 U.S. 122, 123, 50 L. Ed. 2d 339, 341, 97 S. Ct. 399, 399-400, and *Adams v. Texas* (1980), 448 U.S. 38, 44, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2525.

The defendant states that of the 31 veniremen excused for cause on the basis of their opposition to the death penalty only 27 stated that they would automatically vote against it, while the answers of the other four jurors were "equivocal." That characterization is incorrect; it results from the defendant's focus on a single question and answer in isolation from the others. We set out the colloquies in their entirety below. Our examination of them satisfies us that the standards of *Witherspoon* were met.

Juror Mary Wille:

"Q. Mrs. Wille, do you have any scruples, by which I mean strong feelings, by reason of religion or conscience against the death penalty?

A. Yes, I do.

Q. You have scruples against the death penalty,

no matter what the particular facts might be?

A. Yes, I would.

Q. Would your scruples about the death penalty, interfere with or affect your ability to determine guilt or innocence in accordance with the evidence and the law?

A. I think so.

Q. If the defendant is found guilty of the charges before the court, would you consider all of the possible penalties available under state law, including the death penalty?

A. I don't think so.

Q. Would your scruples prevent you from considering the death penalty in the present case?

A. Yes, sir.

Q. It would?

A. I think so.

Q. Would you automatically hold against the death penalty, no matter what the facts of this case reveal?

A. I think so.

Q. You would vote against it?

A. Yes.

THE COURT: Thank you. The Court will excuse you."

Juror Kathryn Parker:

"Q. Ms. Parker, do you have any scruples, by which I mean strong feeling by reason of religion, or conscience against the death penalty?

A. Yes, I do.

Q. Do you have these scruples against the death penalty, no matter what the particular facts might be?

A. Yes.

Q. Would your scruples about the death penalty interfere or affect your ability to determine the guilt or innocence in accordance with the evidence in the law?

A. I believe so.

Q. If the defendant is found guilty of the charges before the court, could you consider all of the possible

penalties available under the state law, including the death penalty?

A. No.

Q. Would your scruples prevent you from considering the death penalty in the appropriate case?

A. Yes.

Q. Would you automatically vote against it; against the death penalty, no matter what the facts of this case reveal?

A. Possibly.

THE COURT: Thank you.

The court will excuse you."

Juror Mable Gibbs:

"Q. Mrs. Gibbs, do you have any scruples, by which I mean strong feelings of religion or conscience against the death penalty?

A. I do.

Q. Do you have these scruples against the death penalty no matter what the particular facts of this case might be?

A. Yes.

Q. Would your scruples about the death penalty interfere with or affect your ability to determine guilt or innocence in accordance with the evidence and the law?

A. No.

Q. It would not interfere with your scruples?

A. I don't think they would.

Q. If the defendant is found guilty of the charges against him before this court, would you consider all of the possible penalties available under the state law, including the death penalty?

A. That's kind of hard, but I don't think so.

Q. Would your scruples prevent you from considering the death penalty in the appropriate case?

A. No.

Q. Would your scruples prevent you from considering the death penalty in the appropriate case?

A. Yes.

Q. Would you automatically vote against the death penalty, no matter what the facts of this case revealed?

A. I think I would.

THE COURT: I will excuse you, Mrs. Gibbs."

Juror Alma Smith:

"Q. Mrs. Smith, do you have any scruples by which I mean strong feelings by reason of religion or conscience against the death penalty?

A. Very much so.

Q. Do you have any scruples against the death penalty no matter what the particular facts might be?

A. Yes.

Q. Would your scruples about the death penalty interfere with your ability to determine the guilt or innocence in accordance with the law?

A. I don't think so.

Q. It would not interfere with it?

A. No.

Q. If the defendant were found guilty of the charge before the court, could you consider all of the possible penalties available under state law including the death penalty?

A. No.

Q. Would your scruples prevent you from considering the death penalty in the appropriate case?

A. I would say so.

Q. Would you be able to consider the death penalty?

A. Oh, no.

Q. Would you automatically vote against the death penalty no matter what the facts of the case would be?

A. I think so."

The defendant's objection to the disqualification of Ms. Wille is that when asked whether she would automatically vote against the death penalty (the seventh in the series of questions propounded to her in the excerpt above), Ms.

Wille said "I think so." When the same inquiry was re-peated, however, Ms. Wille said "Yes." The objection to Ms. Parker is that when asked the same question (the seventh question propounded), she replied "possibly." Shortly be-fore, however, she had stated that she could not consider the death penalty if the defendant were found guilty. Ms. Gibbs' answer to the same question (the eighth of the questions propounded) was, "I think I would," but Ms. Gibbs had also stated that she could not consider imposing the death penalty on the defendant. For the same reason Ms. Smith's response of "I think so" to the same question (the seventh question propounded) cannot be taken as expressing some doubt or reservation.

We think it is appropriate to point out that the distinc-tion drawn in *Witherspoon* between a venireman's general opposition to the death penalty and his unwillingness to vote for its imposition is a sophisticated one which a prospective juror may not readily grasp. While it is the duty of the trial judge to propound the key questions in a form which will be understood and with enough specificity to admit of an unambiguous response, we do not read *With-erspoon* as prescribing a set catechism, or as requiring a venireman to express himself with meticulous preciseness.

The defendant does not contend that the questions initially propounded by the trial judge were defective or insufficient. His position is rather that the trial judge should have propounded additional questions to "clarify" the re-sponses given by the four veniremen. But what these further questions should have been the defendant does not say, nor did he suggest any during the *voir dire*, as he was entitled to do under Rule 234 (73 Ill. 2d R. 234). An answer of "I think I do" rather than "yes," standing in isolation, may be in-adequate. (See *Maxwell v. Bishop* (1970), 398 U.S. 262, 264, 26 L. Ed. 2d 221, 223-24, 90 S. Ct. 1578, 1580.) To ask a venireman if he would consider the death penalty "in the appropriate case" is not a satisfactory form of question, and

an answer to that question standing alone may also be insufficient. We must, however, consider the responses of the veniremen not in isolation but as a whole. But in considering any claimed inconsistencies in the answers given by a venireman, we of course recognize the superior position of the trial judge to ascertain the meaning which the venireman intends to convey.

The State also contends that if the disqualification of the four veniremen should be deemed erroneous, the error was not prejudicial since when the last of them was excused the State had more than four of its allotted peremptory challenges remaining. We do not need to consider that argument, and we express no opinion as to its merits.

The defendant makes the further objection that among those jurors who stated that they would automatically vote against the death penalty six also stated that their opposition to the death penalty would not affect their determination of guilt. The defendant urges that those six persons should not have been excused. *Witherspoon,* of course, states that a juror's automatic opposition to the death penalty *or* his inability to fairly pass on the issue of guilt constitutes a basis for excluding a juror. The defendant recognizes that this is so, but points out that in *Witherspoon* the jury determined guilt and punishment at the same time, whereas Illinois now has a bifurcated proceeding. From this he argues that a juror who states that he would be able to decide the issue of guilt impartially should be permitted to pass on that issue notwithstanding his inability to vote for the death penalty.

The defendant's attempt to distinguish *Witherspoon* on this basis is defeated by the Supreme Court's decision in *Adams v. Texas,* 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521. That case involved a bifurcated proceeding similar to that now employed in Illinois, yet the court observed that *Witherspoon* nevertheless remained applicable. See 448 U.S. 38, 45-46, 65 L. Ed. 2d 581, 589-90, 100 S. Ct. 2521, 2526-27.

As the defendant admits, his theory would require that a new jury be impaneled for the sentencing hearing. The same proposal was made and rejected in *People v. Lewis* (1981), 88 Ill. 2d 129, 146-47, where we pointed out that it was questionable whether there was power to adopt such a procedure under section 9—1(d), and that its adoption would present potential constitutional problems. In *Lewis* we also considered and rejected a related argument, which is also made here, that a jury composed entirely of persons who are not opposed to the death penalty is "conviction-prone." No further discussion of these contentions is required.

The defendant's remaining objection to the jury goes to its racial composition. The defendant, who is black, states that the jury contained no black persons, and that that circumstance resulted from the prosecution's having used some of its peremptory challenges to exclude veniremen who were black but were not subject to removal for cause. The defendant concedes that under *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, the motives of the prosecution in exercising peremptory challenges are not subject to examination absent a showing that blacks have been systematically prevented from serving on particular juries or from jury service in the county or State, a showing not attempted here. (See 380 U.S. 202, 221-23, 13 L. Ed. 2d 759, 773-74, 85 S. Ct. 824, 836-37.) A similar position has been taken by this court in *People v. Harris* (1959), 17 Ill. 2d 446, 450-51, *cert. denied* (1960), 362 U.S. 928, 4 L. Ed. 2d 747, 80 S. Ct. 755; *cf. People v. Powell* (1973), 53 Ill. 2d 465, 477-78; *People v. King* (1973), 54 Ill. 2d 291, 298.

The defendant cites *People v. Wheeler* (1978), 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890, and *Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, *cert. denied* (1979), 444 U.S. 881, 62 L. Ed. 2d 110, 100 S. Ct. 170, in which the supreme courts of California and of Massachusetts rejected *Swain,* and he urges that this court should

follow their lead. As had been the case in *Swain,* the defendants in *Wheeler* and in *Soares* were black, and the victims were white. In *Wheeler,* the prosecution peremptorily challenged all the black veniremen, in *Soares* all but one. In each case the conviction was reversed, the court holding that when a defendant has made a *prima facie* case that the prosecution has excluded veniremen on the basis of their race, the prosecution then has the burden to show that its exclusion of the jurors was based on other grounds.

The question whether this court should depart from the principle adopted by the Supreme Court in *Swain* and overrule its decision in *Harris* is not presented in this case, however. As the State points out, the defendant did not raise this issue until all the jurors had been sworn. Moreover, he failed to make a record which would show that the veniremen who were peremptorily challenged by the State were black. Such a showing is required even under *Wheeler* and *Soares.* See *People v. Wheeler* (1978), 22 Cal. 3d 258, 280, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905; *Commonwealth v. Soares* (1979), 377 Mass. 461, 490, 387 N.E.2d 499, 517.

The defendant objects to the admission into evidence of testimony by Robert Dwyer, an investigator for the Chicago police department, of two telephone conversations made by the defendant which Dwyer overheard on an extension telephone. One of these conversations was between the defendant and his mother, Rebecca Gaines, and the other was between the defendant and his brother Michael. The defendant contends that Dwyer's listening to the conversations was an act of eavesdropping made unlawful by section 14—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 14—2), which provides:

"A person commits eavesdropping when he:

(a) Uses an eavesdropping device to hear or record all or any part of any conversation unless he does so (1) with the consent of all of the parties to such conversation or (2) with the consent of any one party

to such conversation and in accordance with Article 108A of the 'Code of Criminal Procedure of 1963,' approved August 14, 1963, as amended; * * *."

Since section 14—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 14—5) provides that evidence obtained in violation of section 14—2 is inadmissible, the defendant contends that the trial judge erred in denying his motion to exclude this portion of officer Dwyer's testimony.

The term "eavesdropping device" is defined by section 14—1(a) of the Criminal Code of 1961:

"An eavesdropping device is any device capable of being used to hear or record oral conversation whether such conversation is conducted in person, by telephone, or by any other means; Provided, however, that this definition shall not include devices used for the restoration of the deaf or hard-of-hearing to normal or partial hearing." Ill. Rev. Stat. 1979, ch. 38, par. 14—1(a).

Officer Dwyer testified that on December 23, before the defendant had been apprehended and arrested, he called at the home of the defendant's mother, where both the defendant and his brother resided. Both Mrs. Gaines and Michael were present during this visit, as were some other police officers assigned to the investigation. Shortly after Dwyer's arrival, the telephone rang. Michael answered it, and told his mother that the caller was the defendant, and that he wished to speak to her. As Mrs. Gaines approached the telephone, Dwyer asked her if he might listen to the conversation on an extension. She gave Dwyer permission to do so and directed him to an extension phone located in an adjacent room, where Dwyer picked up the instrument.

As Dwyer was about to testify to the conversation he had overheard between the defendant and Mrs. Gaines, defendant's counsel objected to the admission of the testimony and moved for a mistrial. The trial court overruled the objection and denied the motion. Dwyer then testified that the defendant made the following remarks:

"What the f—- are you trying to do to me? Why the f—- isn't the family helping me? I know you're helping the police. What the f—- is wrong with Michael? That's all you give a shit about is Michael. Why aren't you getting me the money."

The defendant then asked to speak to Michael, and Dwyer remained on the extension phone. Over the defendant's continuing objection, Dwyer then reported that after the defendant had begun by saying to Michael, "Boy you ain't doing your part," the following interchange took place:

"Michael responded, 'Ain't no boy here.' He [Dickey] said, 'man, you just covering your ass. Don't you know they can give us the chair for what we done? You ain't even doing your part, man. You ain't even put the gun where you was supposed to.' And Michael said, 'What gun, man? What gun?' Dickey responded, 'Nigger, you crazy Nigger, you know what gun. You ain't even doing your part. I'm going to knock you, man. You're just covering your ass.' Michael then said, 'I'll put it there now, man. I'll put the gun there now.' Dickey said, 'No, you won't man. F—- you. I'll get another gun. They ain't going to take me alive. I'll get another gun. I'll shoot it out with the police."

After the conversation ended, Dwyer testified, he asked one of the other police officers present, Patrick Fleming, "to accompany Michael to get the weapon that he had hidden in the attic." Fleming returned carrying a gun. This gun was admitted into evidence at the trial, and other testimony, whose accuracy is not challenged, showed that the shots that killed the victims Davis and McCall had been fired from it.

The defendant's brief, as is that of the State, is confined to the discussion of whether a telephone extension is an eavesdropping device. Before addressing that question, it is important to consider the basis of the defendant's claim that the admission of Dwyer's testimony was prejudicial and

thus requires reversal of his conviction. The defendant first raised his objection in a pretrial motion to suppress. It appears from colloquies between the trial judge and the defendant's counsel that the court had denied the motion prior to trial.

While the two telephone conversations include comments by the defendant which might amount to admissions of complicity, at the time of these conversations the police had already received information pointing to the defendant from interviews with the victim Thomas and with friends of the defendant whom the latter contacted following the crime. The defendant thus cannot complain that his remarks were incriminatory, and that was not the basis of his objection. Both his brief and statements made to the trial court by his counsel show that his objection is based on the assumption that the eavesdropping of his conversation with his brother enabled the police to locate and to recover the murder weapon.

This assumption is not supported by the evidence. Statements regarding the location of the gun were also made by Michael Gaines during the telephone conversation, and those statements could have been heard by the police officers who were present when they were made. In addition, Officer Fleming, who was also called as a witness, testified that he had had a face-to-face conversation with Michael, after which Michael took him up to the second floor, where Fleming recovered the gun.

The claim by the defendant that the admission of the gun was prejudicial, moreover, has been abandoned on this appeal. At the trial, the defendant did object to the admission of the gun, presumably on the theory that section 14—5 of the Criminal Code of 1961 bars the admission of other evidence obtained through illegal eavesdropping (see *People v. Maslowsky* (1966), 34 Ill. 2d 456, 464-65), but he does not now assert that its admission was error, and he does not contend that his conviction of murder was not

proved beyond a reasonable doubt.

The monitoring of the defendant's telephone conversation, in any event, was not proscribed by section 14—2(a), for an extension telephone is not an eavesdropping device as that term is defined by section 14—1(a). *People v. Dixon* (1961), 22 Ill. 2d 513, so held with respect to the statutory antecedent of section 14—1(a) (Ill. Rev. Stat. 1959, ch. 38, par. 206.1), and that holding is applicable as well to the present section.

The defendant seeks to distinguish *Dixon* on the ground that the provision involved there defined an eavesdropping device as "any device employing electricity" (22 Ill. 2d 513, 516), a qualification omitted from section 14—1(a). The decision in *Dixon*, of course, could not have rested on the proposition that an extension telephone is not a device employing electricity. The basis of the decision was rather that the statute is directed against the use of devices other than the telephone itself when the latter has not been functionally altered.

We also do not agree with the defendant's contention that *Dixon* was overruled by *People v. Kurth* (1966), 34 Ill. 2d 387. In *Kurth* an electronic device to record a telephone conversation was used. The decision turned on the holding that even though the device had been installed by one of the parties to the conversation, another party was not precluded from having the conversation excluded from evidence. The court overruled *Dixon* only with respect to that issue. See 34 Ill. 2d 387, 395.

The significance of a participant's lack of consent to the monitoring or recording of a telephone conversation has varied with the changes which the legislature has made from time to time in section 14—2. (See Ill. Ann. Stat., ch. 38, par. 14—2, Historical Note (Smith-Hurd 1979); *People v. Kezerian* (1979), 77 Ill. 2d 121, 126; *People v. Richardson* (1975), 60 Ill. 2d 189). But the question of consent becomes material only if an eavesdropping device has been em-

ployed.

The defendant refers us to language in *United States v. Harpel* (10th Cir. 1974), 493 F.2d 346, 351-52, that an extension telephone is an eavesdropping device when it is used surreptitiously, as it was here. *Harpel* involved a conviction for violation of a Federal statute forbidding the interception and disclosure of wire communications (18 U.S.C. §§2510 to 2520 (1970)). Section 2510(5)(a)(i) of the Federal act, which defines those devices whose use constitutes unlawful interception, is structured so differently from section 14—1(a) that the construction given to it in *Harpel* would not further the defendant's contention that *People v. Dixon* should be overruled. We also cannot accept his undocumented assertion that the Federal act somehow preempts State regulation of wire communications claimed to be less stringent. To the extent that the defendant is maintaining that the Illinois statute violates the ban against unreasonable searches and seizures found in either the Federal or the Illinois constitution, that claim was carefully considered and was rejected in *People v. Richardson* (1975), 60 Ill. 2d 189. See also *People v. Kezerian* (1979), 77 Ill. 2d 121, 127-28.

The construction of section 14—1(a) urged by the defendant, whereby the surreptitious monitoring of the statements made by the defendant during his telephone conversation would constitute illegal eavesdropping, would, to be sure, give greater protection to the person who is the subject of eavesdropping. What the defendant overlooks is that section 14—1(a) excludes evidence acquired through eavesdropping only if the acquisition was a criminal offense (*People v. Kurth* (1966), 34 Ill. 2d 387, 396 (concurring opinion by Justice Schaefer)). To protect a person who uses an extension phone for a purpose other than to obtain evidence of criminal conduct would require a major recasting of section 14—1(a). This the General Assembly has not done, even though its frequent amendments

of section 14—2 display its awareness of the problem inherent in the regulation of telephone eavesdropping.

The defendant objects to the admission into evidence of subsequent testimony of Officer Dwyer to a conversation with the defendant after the identification of the latter by Thomas at a police lineup.

Dwyer testified that after giving the defendant his *Miranda* warnings, he told the latter that he had just been identified as the person who had killed Davis and McCall, and also told the defendant "he had been implicated by his own brother as the person who killed these two * * *." At this point the defendant objected and moved for a mistrial. The basis for the objection and the motion was that testimony as to statements made to the witness by Michael Gaines would be hearsay and would deny the defendant his right of confrontation under *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. The court overruled the objection and denied the motion. Dwyer then went on to testify, "I also called to his attention that we did in fact have the murder weapon in custody and that his brother had given us an accounting of the whole sequence of events." The defendant renewed his objection and his motion, and the court made the same ruling as before.

In a conference held outside the presence of the jury the court stated that if Dwyer's further testimony should be that the defendant had orally admitted the statements allegedly made by his brother, Dwyer's testimony would be admissible. The court said:

"At this point I am going to allow them [the prosecution] to continue and get to the point. Then if you still have an objection after you hear the answer, then I'll have to rule again as to whether I am going to direct the jury, sustain your objection and direct the jury to disregard."

Dwyer next testified that he had told the defendant of having listened in to the telephone conversation with Michael Gaines on December 23, in which, Dwyer testified,

the defendant and his brother "discussed certain elements of this offense," to which the defendant replied that he knew that the police were listening in. The defendant's counsel did not renew his objection at this juncture, and he did not cross-examine the witness.

We need not decide whether the admission of this part of Dwyer's testimony violated the *Bruton* rule, however, since the uncontroverted eyewitness testimony of Thomas was sufficient to sustain the defendant's conviction of murder, and the admission of Dwyer's testimony would be harmless error. *Brown v. United States* (1973), 411 U.S. 223, 36 L. Ed. 2d 208, 93 S. Ct. 1565; *Schneble v. Florida* (1972), 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056; *Harrington v. California* (1969), 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726.

Testimony was given at the trial that the defendant had escaped from the Cook County jail where he was being confined awaiting trial. He was recaptured in a few hours. The defendant does not deny that the jury could properly consider his escape as evidence tending to show guilt (see *People v. Gambino* (1957), 12 Ill. 2d 29, 32; *People v. Harper* (1967), 36 Ill. 2d 398, 403-04), but he complains that the court failed to instruct the jury "how it should use the evidence of escape." This omission, according to the defendant, improperly permitted the jury to conclude that the fact of escape by itself overcame the presumption of innocence, on which the jury was correctly instructed.

Chapter 3.00 of the Illinois Pattern Jury Instructions, Criminal (1968), contains no recommended instruction to define the evidentiary significance of escape, and in section 3.03, which relates to the analogous situation of flight from the scene of a crime, the committee recommended that no instruction be given on this subject. The defendant, moreover, does not state what instruction should have been given, and he tendered none at the trial. Capital cases, like other criminal proceedings, are subject to the general rule

that the court is under no obligation to give instructions not tendered by counsel. *People v. Carlson* (1980), 79 Ill. 2d 564, 584.

The remaining contention made by the defendant regarding his trial is that he was not proved guilty beyond a reasonable doubt of the charges of armed robbery of Thomas and Davis. As to Thomas, his testimony was that when the defendant pointed a pistol at him and said, "This is a stick-up," Thomas pulled two dollar bills out of his pocket and dropped them to the floor. Later, when he left the room, he found only one of the bills. The defendant suggests that the other bill might have been lying somewhere on the floor. The defendant's position is thus that no robbery takes place unless the accused takes physical possession of the property which he has forced the defendant to surrender.

The defendant's position misinterprets section 18—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 18—1(a)), which defines robbery as follows:

"A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force."

In *People v. Smith* (1980), 78 Ill. 2d 298, 303, we stated, "The offense of robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will." To constitute the offense of robbery it is not necessary that the defendant have picked up and carried off any of the bills.

In his opening brief the defendant complained that proof was also lacking of the armed robbery of McCall, to which the State responded that that offense had not been charged. The defendant then was given leave to amend his brief to allege that there had been no proof of the armed robbery of Davis, to which the State responds that a robbery of Davis did occur, since the robbery of Thomas took place while Davis was present. The State's contention

also misreads section 18—1. The property taken must have been taken from the victim of the robbery (*People v. Braverman* (1930), 340 Ill. 525, 531; *People v. Smith* (1980), 78 Ill. 2d 298, 302-05). There was no evidence whatever that the defendant took anything of value from Davis. We therefore agree that the conviction of the defendant of the armed robbery of Davis must be reversed. As will appear from our discussion of the defendant's challenges to the death sentence imposed upon him, the reversal of that judgment of conviction does not invalidate the sentence.

We hold, therefore, that with the exception of the charge of armed robbery of Davis, the conviction of the defendant is affirmed. We turn next to the defendant's contentions that the judgment sentencing him to death must be vacated, considering first his claims that the Act violates provisions of the Federal and State constitutions, some of which have already been disposed of by prior decisions of this court.

The defendant asserts that the power given the State's Attorney to determine whether he will seek the death penalty in a particular case improperly delegates legislative authority to the State's Attorney of each county, and that it confers upon the executive branch of the government a power which belongs to the judiciary in violation of article II, section 1, of the Constitution of Illinois (Ill. Const. 1970, art. II, § 1). These contentions were fully considered and rejected in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603. The decision in *Cousins* was followed in *People v. Brownell* (1980), 79 Ill. 2d 508, 527-28, *appeal dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59, and in *People v. Lewis* (1981), 88 Ill. 2d 129, 146. The same is true of the related contention that the Act fails to provide sufficiently specific standards to guide the various State's Attorneys. The settled course of decision by this court renders further discussion of these issues superfluous.

Objection is also made to the Act's omission of a requirement that the State give notice to a defendant before trial of the State's intention to seek the death penalty. Such an omission, it is said, deprives a defendant of the effective assistance of counsel, because it impairs his ability to decide whether to bargain for a negotiated plea and whether to demand or to waive a jury trial.

No claim is made and the record does not show that the defendant was disabled in any way by ignorance of the prosecutor's intention to request a sentencing hearing if he were convicted of murder. On the contrary, before the process of selecting a jury had even begun, the defendant's counsel told the court, "I suppose we previously discussed this, the State, I gather, is intending to seek the death penalty." The case is thus quite unlike *People v. Walker* (1981), 84 Ill. 2d 512, where the record showed that the accused was misled into believing that the State would not do so.

Since the indictments here charged the commission of multiple murders and the commission of murder in the course of another felony, the defendant was informed that he could, potentially, be sentenced to death. (*Cf. People v. Brownell* (1980), 79 Ill. 2d 508, 525.) To require that in all cases the State must give pretrial notice of its intention to seek the death penalty would necessarily defeat the prosecutor's informed exercise of the discretion to which we held he is entitled in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 543. The defendant himself concedes that that is so, for in his reply brief he urges simply that *Cousins* be overruled.

The defendant objects to the sentencing proceedings on several grounds: the admission of testimony by two deputy sheriffs concerning his conduct outside the courtroom; the failure to present a presentence report; the denial of his motion for leave to address the jury; the jury's failure to find that there was no possibility of his rehabilitation; its failure

to specify which aggravating factor it relied upon; and the refusal of the judge to review and set aside the verdict. Lastly the defendant contends that his execution is barred by the Illinois Post-Conviction Hearing Act (Ill. Rev. Stat. 1979, ch. 38, par. 122—1 *et seq.*). We take up these objections in the same order.

At the sentencing hearing the prosecution called as witnesses two deputy sheriffs who had been assigned to the courtroom in which the trial was held. These witnesses, whose duties included keeping order in the courtroom and transporting prisoners between the lockup and the courtroom, testified that the defendant had engaged in acts of misconduct in their presence on three occasions described earlier in this opinion. Each witness was asked on cross-examination whether he had ever taken an oath as a deputy bailiff for the jury, and stated that he had. No further questions were put to these witnesses. The defendant's motion to strike their testimony was denied. The defendant contends that the court's ruling was erroneous under *Turner v. Louisiana* (1965), 379 U.S. 466, 13 L. Ed. 2d 424, 85 S. Ct. 546.

In *Turner* the defendant was found guilty by a jury on a charge of murder, and was sentenced to death. The principal witnesses for the prosecution were two deputy sheriffs who had been involved in the investigation of the crime and the arrest of the defendant. They testified to oral admissions and a written confession of the defendant, who did not himself take the stand. The jury was sequestered during the trial. It was placed in the charge of the two deputies as bailiffs. In the course of a hearing held on a motion by the defendant for a mistrial the witnesses testified to the particulars of their contacts with the jury which showed, the Supreme Court found, that the witnesses had "freely mingled and conversed with the jurors in and out of the courthouse during the trial." (379 U.S. 466, 468, 13 L. Ed. 2d 424, 426, 85 S. Ct. 546, 547.) The court held that despite the

lack of any evidence that either deputy had ever spoken to a juror about the case, the conviction of the defendant violated the fourteenth amendment, stating:

> "[E]ven if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. * * *.
>
> It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that Simmons and Rispone [the deputy sheriffs] played as deputies made the association even more prejudicial. For the relationship was one ·which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial. * * *." (Emphasis in original.) 379 U.S. 466, 473-74, 13 L. Ed. 2d 424, 429-30, 85 S. Ct. 546, 550.

The present case differs from *Turner* in several respects: The witnesses did not participate in the investigation of the crime or the apprehension and arrest of the defendant. They did not testify at the trial, and their testimony accordingly played no role in the jury's verdict of guilty. Their testimony at the sentencing hearing related only to the occurrence of an additional aggravating factor. Without it the defendant could still have been sentenced to death in the absence of mitigating factors sufficient to preclude the imposition of the death sentence. Most significantly, there was no testimony, and the defendant did not seek to elicit any from the witnesses, concerning the character or extent of their contacts with the jurors. Thus there was no showing that there existed a "close and continual association" between them, and hence no basis to infer the existence of a relationship which would "foster the jurors' confidence" in the witnesses. See *Turner v. Louisiana* (1965), 379 U.S. 466,

468, 474, 13 L. Ed. 2d 424, 426, 430, 85 S. Ct. 546, 547, 550.

Although the record is silent, the State asserts that the two deputies were transferred to a different courtroom following the last of the three episodes to which they testified, which took place on October 10, the last day of the trial and only five days before the sentencing hearing began.

The defendant points out that the termination of the deputies' role as bailiffs after the events to which they testified would not necessarily eliminate the problem which concerned the court in *Turner*. We may concede that if a "close and continual association" already existed between the witnesses and the jurors, the removal of the former might not dissipate the prejudicial effect of their testimony. We do not agree, however, with the remedy which the defendant proposes, that "deputies involved with the defendant in the lock-up, jail or whatever should be prevented from having contact with the courtroom or other [*sic*] jurors. When the defendant enters the courtroom different deputies would be used."

Unless knowledge of criminal acts by a defendant committed in the presence of his custodians, including attempts to escape, is to be denied the sentencing jury, those deputy sheriffs assigned to escort a defendant between the courtroom and the lockup or the county jail could never serve as bailiffs for the jury. To require such a practice could impose a substantial burden upon units of local government, particularly those of less populated counties. For the reasons given above, we do not consider that the testimony complained of invalidated the death sentence imposed in this case. *Cf. People v. Rettig* (1972), 50 Ill. 2d 317, *cert. denied* (1972), 409 U.S. 895, 34 L. Ed. 2d 152, 93 S. Ct. 186.

The defendant objects that no presentence report was made, notwithstanding section 5—3—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—3—1),

which provides: "A defendant shall not be sentenced for a felony before a written presentence report of investigation is presented to and considered by the court."

Although murder is a felony, it does not follow that section 5—3—1 was applicable here. Chapter V of the Unified Code of Corrections, of which this section forms a part, deals with sentences other than sentences of death, such as sentences of imprisonment, periodic imprisonment, probation, and conditional discharge. We held in *People v. Youngbey* (1980), 82 Ill. 2d 556, that section 5—3—1, where applicable, cannot be waived by the defendant, since one of its purposes is to acquaint the sentencing judge with the defendant's criminal history, thus assisting the judge in choosing among the various dispositions which are authorized by section 5—5—3 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3).

In the present case no sentencing options were available to the court, for it was required to sentence the defendant to death after the jury returned a verdict that there were no mitigating factors sufficient to preclude that sentence. (*People v. Lewis* (1981), 88 Ill. 2d 129, 150-51.) Section 5—3—1 of the Code of Corrections thus could have no application here. We express no opinion whether section 5—3—1 would or would not apply in a case where the jury does not return such a verdict, with the result that the court must impose a sentence of imprisonment.

The defendant argues that if the jury is given the ultimate sentencing power, then a presentence report must be prepared and presented to the jury. The jury must of course consider those mitigating factors enumerated in section 9—1(c) and any information bearing on other mitigating factors which is brought to its attention. Such information could include items which fall within the categories enumerated in section 5—3—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—3—2). The defendant fails to show in what way the preparation

and presentation of a formal presentence report to the jury would provide it with additional relevant information for its consideration.

The defendant also contends that he was denied what he characterizes as his constitutional right of allocution. The nature of the defendant's claim appears from the motion which he made orally just before the beginning of the sentencing hearing. In that motion he requested that he be allowed "to make a statement to the jury, not under oath, and not subject to cross examination." The State objected, and the court denied the motion.

After the State had rested its case in chief, which has been previously described, the defendant renewed his motion, which was again denied. The defendant put in no evidence and rested his case. After the jury had returned its verdict, and after motions by the defendant in arrest of judgment, for judgment of acquittal notwithstanding the verdict, and for new trial had been denied, the court said to the defendant, "Mr. Gaines, would you like to say anything?" The defendant answered "No." Sentence was then pronounced. We do not consider that the trial court's denial of the defendant's motion constituted prejudicial error.

Allocution at common law referred to the inquiry which the court made of the defendant, upon return of a guilty verdict in a capital case, whether the defendant had any reason to offer why judgment should not be entered against him. The purpose of the allocution was not to afford an opportunity to present mitigating evidence or to plead for leniency but rather to disclose certain special circumstances, such as benefit of clergy, which precluded execution of the sentence. (See Barrett, *Allocution*, 9 Mo. L. Rev. 115 (1944); Note, *Procedural Due Process at Judicial Sentencing for Felony*, 81 Harv. L. Rev. 821, 832-33 (1968)). At common law this opportunity for the defendant to make a personal statement was of particular importance, since he was not entitled to be represented by counsel, and was not

considered competent to testify as a witness in his own behalf. See *McGautha v. California* (1971), 402 U.S. 183, 217, 28 L. Ed. 2d 711, 732, 91 S. Ct. 1454, 1472; *Green v. United States* (1961), 365 U.S. 301, 304, 5 L. Ed. 2d 670, 673, 81 S. Ct. 653, 655.

The practice of allocution has been followed to varying degrees in many American jurisdictions, although in some the practice is regarded as having no more than a cere-monial character because of the safeguards which modern criminal procedure now provides to the defendant. (See Annot., 96 A.L.R.2d 1292 (1964)). In Illinois prior to the enactment in 1972 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1001—1—1 *et seq.*), there appears to have been no statute relating to allocution. In *Gannon v. People* (1889), 127 Ill. 507, 521, this court held: "[W]hile it is a better practice to call upon the defendant to say why he should not be sentenced, yet the omission to do so is no ground for reversal in any case." That view of the matter was adhered to in later decisions. See, *e.g., Lamb v. People* (1905), 219 Ill. 399; *People v. Shaw* (1971), 49 Ill. 2d 309, 313.

As originally enacted, section 5—4—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—4—1(a)), which specifies the sentencing procedures to be followed in criminal proceedings generally, provided:

"After a determination of guilt, a hearing shall be held to impose the sentence. At the hearing the court shall:

(1) consider the evidence, if any, received upon the trial;

(2) consider any presentence reports;

(3) consider evidence and information of-fered by the parties in aggravation and mitigation;

(4) hear arguments as to sentencing alterna-tives; and

(5) afford the defendant the opportunity to make a statement in his own behalf."

Following the enactment in 1977 of the amendatory legislation to section 9—1 of the Criminal Code of 1961 which established the present bifurcated trial for aggravated murder, subsection 5—4—1(a) of the Unified Code of Corrections was amended by adding at its beginning the exclusionary phrase, "Except when the death penalty is sought under hearing procedures otherwise specified." (Pub. Act 80—1099; Pub. Act 80—1387.) This legislation had become effective when the defendant committed the crimes of which he was here convicted, and therefore no right to be given an opportunity to make a statement in his own behalf was conferred on the defendant by virtue of section 5—4—1(a).

So far as section 9—1 of the Criminal Code of 1961 is concerned, subsection (e) of course allows the defendant to testify at the sentencing hearing, but it does not require in terms that the defendant be given an opportunity to speak other than as a witness. A defendant in a criminal proceeding who testifies in his own behalf is subject to reasonable cross-examination (*People v. Miller* (1930), 342 Ill. 244, 252; *McGautha v. California* (1971), 402 U.S. 183, 215, 28 L. Ed. 2d 711, 731, 91 S. Ct. 1454, 1471), and no reason appears why an exception to that principle should be read into section 9—1(e) by implication.

The defendant cites no decision of this court supporting his claim that he had a constitutional right to address the jury, but relies solely on the decision of the Supreme Court in *Green v. United States* (1961), 365 U.S. 301, 5 L. Ed. 2d 670, 81 S. Ct. 653. That case involved the application of Rule 32 of the Federal Rules of Criminal Procedure to a conviction for a Federal crime. Rule 32(a) provided in pertinent part:

> "Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment."

In *Green,* at the close of the proceedings leading to the defendant's conviction, which took place in 1952, the Federal district judge asked, "Did you want to say something?" (365 U.S. 301, 304, 5 L. Ed. 2d 670, 673, 81 S. Ct. 653, 655), and the defendant's counsel then responded by mentioning various circumstances of a mitigating character. The judge then pronounced sentence. Seven years later the defendant filed a petition to vacate his sentence under Rule 35 of the Federal Rules of Criminal Procedure, claiming that the sentence was rendered illegal by the district judge's failure to ask the defendant whether he had anything to say on his own behalf.

The Supreme Court affirmed the denial of the petition on the ground that the judge's initial inquiry might have been directed to the defendant rather than his counsel. The court went on to make the following statement, however:

"Trial judges before sentencing should, as a matter of good judicial administration, unambiguously address themselves to the defendant. Hereafter trial judges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing." 365 U.S. 301, 305, 5 L. Ed. 2d 670, 674, 81 S. Ct. 653, 655.

Rule 32(a) was amended in 1966 to incorporate the suggestion made in *Green* (18 U.S.C. Rule 32, Notes of Advisory Committee on Rules (1970)). *Green* must be read in the light of *Hill v. United States* (1962), 368 U.S. 424, 7 L. Ed. 2d 417, 82 S. Ct. 468, however. In *Hill* the district judge had imposed sentence without making the inquiry of the defendant. No appeal was taken from the conviction, but the defendant subsequently made a collateral attack on his conviction by a petition filed under section 2255 of Title 28 of the United States Code (1958), which provides for vacation of a sentence imposed by a Federal court where "the sentence was imposed in violation of the Constitution or laws of the United States." The Supreme Court, noting

that the relief available under section 2255 was no more extensive than that which had been available by *habeas corpus,* stated:

> "The failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus. It is an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure.
>
> * * *
>
> It is to be noted that we are not dealing here with a case where the defendant was affirmatively denied an opportunity to speak during the hearing at which his sentence was imposed. Nor is it suggested that in imposing the sentence the District Judge was either misinformed or uninformed as to any relevant circumstances. Indeed, there is no claim that the defendant would have had anything at all to say if he had been formally invited to speak. Whether § 2255 relief would be available if a violation of Rule 32(a) occurred in the context of other aggravating circumstances is a question we therefore do not consider. We decide only that such collateral relief is not available when all that is shown is a failure to comply with the formal requirements of the Rule." 368 U.S. 424, 428-29, 7 L. Ed. 2d 417, 421-22, 82 S. Ct. 468, 471-72.

In *McGautha v. California* (1971), 402 U.S. 183, 219 n.22, 28 L. Ed. 2d 711, 733 n.22, 91 S. Ct. 1454, 1473 n.22, the Supreme Court noted that the question whether an affirmative refusal to let a defendant speak was unconstitutional was still open, and the defendant here refers us to no later decision in which the Supreme Court has addressed that question.

It is not clear, moreover, that the question is even presented in this case, for the defendant was ultimately

afforded an opportunity to speak but declined to exercise it. The defendant says that that opportunity came too late to be meaningful since the jury had already returned its sentencing verdict, and since, as we have held in *People v. Lewis* (1981), 88 Ill. 2d 129, 147-48, the trial judge had no power to disregard it. It remains true, nevertheless, that the defendant's negative response to the court's inquiry and his failure to offer any evidence at the sentencing hearing indicate that the defendant would not "have had anything at all to say" had he been allowed to address the jury. As in *Hill*, no claim is made to the contrary. *Cf. Gordon v. United States* (5th Cir. 1971), 438 F.2d 858, 880, *cert. denied* (1971), 404 U.S. 828, 30 L. Ed. 2d 56, 92 S. Ct. 139.

In addition to his claim that the denial of his request to address the jury deprived him of due process, the defendant contends that the equal protection clause was also violated, since in cases where the prosecution does not seek the death penalty a defendant is given the opportunity to make a statement by virtue of section 5—4—1(a)(5) of the Unified Code of Corrections. In support of this contention the defendant cites *Griffin v. Illinois* (1956), 351 U.S. 12, 100 L. Ed. 891, 76 S. Ct. 585. In *Griffin* the court held that if a transcript of proceedings was necessary in order to obtain full appellate review of a conviction, the State must supply one free to a criminal defendant who was indigent. While the court noted that the Illinois statutes did provide for a free transcript to be furnished to defendants who had been sentenced to death, it was not the differentiation in treatment as between capital and noncapital defendants which prompted the holding of unconstitutionality, but rather the differentiation between defendants who were indigent and those who were not.

In *People ex rel. Tucker v. Kotsos* (1977), 68 Ill. 2d 88, this court held that to deny bail to persons incarcerated pending the outcome of proceedings for revocation of parole while making bail available to persons incarcerated

pending the outcome of proceedings to revoke probation did not offend the equal protection clause. In so holding the court took the position that the normal deference to legislative classifications should not be departed from unless the classification either impinged on some right deemed fundamental or was directed against a "suspect class." 68 Ill. 2d 88, 96-97; *People v. Valley Steel Products Co.* (1978), 71 Ill. 2d 408, 420-21.

We doubt whether a defendant's interest in making a statement in his own behalf approaches in importance his interest in securing effective appellate review. We also doubt that a classification based on the nature of the crime committed by the defendant can be equated with a classification based on race, sex, or economic status. But in any event the defendant has not shown that he was adversely affected by the classification of which he complains. What section 5—4—1(a)(5) provides is the right of allocution in its traditional context: the opportunity to make a statement to the court in the course of a sentencing procedure in which the jury plays no role. That opportunity, even though it is not required by the statute, was offered him. What the defendant sought was the opportunity to make an unsworn statement to the sentencing jury for consideration along with testimony given under oath and the arguments of counsel. The legislature may well have considered that such a statement would at the least confuse the jurors, and might also impair their ability to weigh the aggravating and mitigating factors disclosed by the testimony as the statute directs them to do.

The defendant asserts that the Act violates the portion of article I, section 11, of the 1970 Illinois Constitution which provides: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." His objection is that the Act does not require either the sentencing jury or the court to make a determination that

there is no likelihood that the defendant can be restored to useful citizenship, and that no such finding was made. As noted elsewhere in this opinion, the Act requires the court to enter judgment on the jury's verdict, and discussion of the defendant's objection is therefore limited to his claim that the jury must make the determination referred to.

The constitutional provision does not reflect any intention of the constitutional convention to prohibit imposition of the death penalty. On the contrary, article VI, section 4(b), of the 1970 Illinois Constitution, which provides that appeals in capital cases shall be taken directly to this court, presupposes that death sentences will be given. Moreover, the Constitutional Convention submitted to the voters on a separate ballot the question whether the death penalty should be abolished, and the proposition was not approved. Ill. Ann. Stat., art. I, § 11 Constitutional Commentary, at 545 (Smith-Hurd 1971).

The legislature has implemented the Constitutional directive by section 1—1—2 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1001—1—2), which states:

> "The purposes of this Code of Corrections are to:
>
> (a) prescribe sanctions proportionate to the seriousness of the offenses and permit the recognition of differences in rehabilitation possibilities among individual offenders;
>
> (b) forbid and prevent the commission of offenses;
>
> (c) prevent arbitrary or oppressive treatment of persons adjudicated offenders or delinquents; and
>
> (d) restore offenders to useful citizenship."

The meaning of article I, section 11, has been considered in connection with contentions that the term of imprisonment to which a defendant was sentenced was unduly long (*People v. Carlson* (1980), 79 Ill. 2d 564; *People v. Perruquet* (1977), 68 Ill. 2d 149), or that probation should

have been granted (*People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552; *People v. Waud* (1977), 69 Ill. 2d 588). These decisions confirm what is implicit in the language of article I, section 11, of the Constitution, and section 1—1—2 of the Unified Code of Corrections: The possibility of an individual offender's rehabilitation is not the sole factor to be considered in sentencing, and the court is also to consider whether the seriousness of the offense and the protection of the interests of society call for a sentence of severity. *People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 556-57; *People v. Perruquet* (1977), 68 Ill. 2d 149, 155; *People v. Waud* (1977), 69 Ill. 2d 588, 596; *cf. People v. Carlson* (1980), 79 Ill. 2d 564, 587.

Upon a conviction of murder, the alternative to a death sentence is a determinate sentence of imprisonment for either a term of not less than 20 and not more than 40 years or a term of natural life imprisonment. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1).) For this reason the legislature might reasonably have concluded that the rehabilitative potential of the offender was not a relevant factor and that the jury need not consider it.

Even if the contrary assumption is made, however, we find no prejudicial error. Section 9—1(c) of the Act requires that the jury consider "any mitigating factors which are relevant to the imposition of the death penalty" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)), including factors other than those included in the Act. The jury was instructed to consider not only the mitigating factors enumerated in section 9—1(c) but also "any other facts or circumstances that provide reasons for imposing less than the death penalty." The defendant introduced no evidence at the sentencing hearing; he did not object to the instruction given by the court; he tendered no instruction directing the jury explicitly to consider whether the defendant could be restored to useful citizenship; and in argument to the jury his counsel did not assert that the defendant had a potential

for rehabilitation.

The defendant contends that the Act does not provide for meaningful appellate review, since it does not require the jury to make specific findings of what aggravating and mitigating factors it relied upon in reaching its verdict. As a result, according to the defendant, this court cannot make a comparison between this and other capital cases, and therefore cannot prevent the death penalty from being inflicted capriciously. This general contention was rejected in *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44 (*cf. People v. Lewis* (1981), 88 Ill. 2d 129, 146-47), and our holding there also disposes of the particular objection made by the defendant to the verdict in the present case.

As stated previously in this opinion, the defendant was found guilty of the murder of Davis and McCall and of the armed robbery of Davis and Thomas. The sentencing hearing was conducted in two phases, of which the first was concerned only with whether the defendant was eligible for a death sentence under section 9—1(b). This phase terminated in the return of a verdict which contained the following finding:

> "We further unanimously find beyond a reasonable doubt that the following statutory aggravating factor exists in relation to this offense: The murdered individual was killed in the course of an armed robbery, *or* the defendant has been convicted of murdering two or more individuals." (Emphasis added.)

This language is the same as that of the form of verdict which was submitted by the State and was given to the jury without objection.

In the second phase of the sentencing hearing, which involved the jury's consideration of aggravating and mitigating factors under section 9—1(c), the verdict, which also followed a form of verdict submitted without objection from the defendant, was as follows:

> "We, the jury having found the existence of a

statutory aggravating factor, have considered aggravating and mitigating factors relating to the imposition of the death penalty in this case.

We unanimously conclude that there are no sufficiently mitigating factors to preclude the imposition of the death sentence upon the defendant DICKEY GAINES and that the court shall sentence the defendant to death."

Because the finding in the first verdict establishing eligibility for a death sentence is stated only in the disjunctive, the defendant argues, the sentencing verdict must be regarded as leaving unspecified the aggravating factor on which it is based. As we have just pointed out, however, under the decision in *Brownell* specificity in this regard is not required.

The defendant goes on to argue, however, that if the death sentence rests on a finding that the murdered individual was killed in the course of an armed robbery, the sentence cannot stand, since no armed robbery took place. This latter assertion is based on the contention discussed earlier in this opinion that there was no proof of an armed robbery either of Davis or of Thomas. We have, of course, held that the robbery of Thomas was proved, even though that of Davis was not, but in any event the existence of the other aggravating factor, that the defendant was convicted of murdering two or more individuals, is not disputed.

Objection is also made to the denial by the trial court of the defendant's motion to set aside the sentencing verdict as erroneous. Under the holding of *People v. Lewis* (1981), 88 Ill. 2d 129, 147-48, the court was without authority to do so.

The defendant contends that his execution is barred by section 122—1 of the Illinois Post-Conviction Hearing Act (Ill. Rev. Stat. 1979, ch. 38, part. 122—1), which provides in pertinent part:

"Any person imprisoned in the penitentiary who asserts that in the proceedings which resulted in his

conviction there was substantial denial of his rights under the Constitution of the United States or of the State of Illinois or both may institute a proceeding under this Article. *** No proceedings under this Article shall be commenced more than 20 years after rendition of final judgment, unless the petitioner alleges facts showing that the delay was not due to his culpable negligence."

Citing *People v. Dale* (1950), 406 Ill. 238, 247, *People v. Lewis* (1952), 413 Ill. 116, 120, and *People v. Thomas* (1970), 45 Ill. 2d 68, 73, the defendant maintains that since his sentence ordered that he be confined in the penitentiary while awaiting execution, section 122—1 applies to him, and that he is entitled to relief on the same basis as a person who is confined in the penitentiary pursuant to a sentence of imprisonment. Such a person, he states, may apply for post-conviction relief should new evidence be discovered showing that he did not commit the crimes of which he was convicted, or if a future decision by the Supreme Court should confer some new constitutional right which was not recognized when the defendant was tried and convicted. As illustrations of that situation the defendant cites *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, *Gideon v. Wainright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792, and *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

The defendant argues that a person who is sentenced to capital punishment, on the other hand, is deprived of post-conviction relief in such circumstances, since his execution will have rendered his case moot. The defendant thus concludes that if section 122—1 is to be given effect he cannot be executed until November 2, 1999, 20 years after his conviction. If the death penalty act is not so construed, he urges, then it is invalid under the equal protection clause as creating an unreasonable classificaton between those persons who are sentenced to death and those who are sen-

tenced to imprisonment.

So far as the question of statutory construction is concerned, the defendant's argument is plainly unsound. Both in 1949, when the Post Conviction Hearing Act was enacted, and in 1965, when section 122—1 was amended to increase the limitations period to 20 years after conviction, the death penalty existed in Ilinois, its legitimacy as yet undisturbed by *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726, and *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562. The present death penalty act, which was passed in 1977, contains no provision that the execution of a death sentence should be stayed for 20 years (during which the defendant would necessarily be kept in prison), and it is inconceivable that the legislature intended such an anomalous result. Nor is it true that the legislature may not constitutionally differentiate between those persons who have been sentenced to death and those who have been sentenced to imprisonment. *People ex rel. Tucker v. Kotsos* (1977), 68 Ill. 2d 88, 96-98.

Whether new evidence exculpating the defendant would be discovered, and whether some future decision will announce a new doctrine which would invalidate his conviction are at best speculative. But that consideration aside, the deprivation of any such potential benefits does not spring from the limitations of the Post-Conviction Hearing Act, but from the defendant's death.

The defendant's argument thus reduces to the proposition that the death penalty is *per se* unconstitutional. That view was adopted by the Supreme Judicial Court of Massachusetts in *District Attorney v. Watson* (1980), ___ Mass. ___ 411 N.E.2d 1274, cited by the defendant, where the court held that the death penalty violated a provision of the State Constitution forbidding cruel or unusual punishment. The court's opinion cites the same loss of potential future benefits on which the defendant rests his argument here. (See ___ Mass. ___, ___, 411 N.E.2d 1274, 1282.) Such

a view finds no support, however, in either the decisions of this court or those of the United States Supreme Court, only two of whose members subscribe to it. See, *e.g., Gregg v. Georgia* (1976), 428 U.S. 153, 227, 231, 49 L. Ed. 2d 859, 904, 907, 96 S. Ct. 2909 (dissenting opinions of Justice Brennan and Justice Marshall).

For the reasons given in this opinion, the judgment of the circuit court of Cook County convicting the defendant of murder and sentencing him to death is affirmed. It is directed that the sentence shall be carried out on Wednesday, September 22, 1982, at the Illinois State Penitentiary in Joliet.

*Judgment affirmed.*

CHIEF JUSTICE GOLDENHERSH, concurring:

For the reasons stated in my concurrence in *People v. Lewis* (1981), 88 Ill. 2d 129, I concur in this opinion.

JUSTICE CLARK, dissenting:

On December 23, 1978, Officer Dwyer, at the home of the defendant's mother and with her permission, monitored the phone conversation between the defendant and his mother. He did this by picking up the extension telephone located in the next room. Under section 14—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 14—2), a person does not commit eavesdropping if all of the parties to the conversation have consented or any party gives permission and the use of an eavesdropping device has been judicially authorized (Ill. Rev. Stat. 1977, ch. 38, par. 14—2; Ill. Rev. Stat. 1977, ch. 38, par. 108A *et seq.*). Section 108A—6 of the Code of Criminal Procedure of 1963 provides for an emergency exception to normal procedures. If a reasonable effort has been made to contact the appropriate State's Attorney, a law-enforcement officer may use an eavesdropping device in an "emergency situation." An emergency situation exists when the conversation to be

"overheard" will occur shortly and the officer had not been aware for a sufficiently long enough time to obtain prior judicial approval (Ill. Rev. Stat. 1977, ch. 38, par. 108A—6). Officer Dwyer did not have the consent of both parties to the conversation. He did not obtain prior judicial approval, and he made no effort to contact the appropriate State's Attorney. A persuasive argument could have been proffered that in this case it would have been physically impossible for Officer Dwyer to obtain prior approval or even attempt to contact a State's Attorney. However, in all "emergency" situations an application for approval of the use of an eavesdropping device "*** must be made within 48 hours of the commencement of such use. *** In order to approve such emergency use, the judge must make a determination (1) that he would have granted an order had *the information been before the court prior to the use of the* device and (2) that there was an emergency situation as defined in this Section." (Ill. Rev. Stat. 1977, ch. 38, par. 108A—6(b).) No application was ever made. It is axiomatic that without such an application no authorization could have been given. Without subsequent approval the contents of the conversation overheard are treated as having been obtained in violation of the article 108A requirements mandating judicial supervision (Ill. Rev. Stat. 1977, ch. 38, par. 108A—6(c)). And without such authorization, section 14—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 14—5) provides that any evidence obtained as a result of the eavesdropping (as defined in section 14—2) is inadmissible *(People v. Kurth* (1966), 34 Ill. 2d 387).

The majority holds that since an extension telephone did not constitute an eavesdropping device, as defined by section 14—1(a), then the monitoring of the conversation was not proscribed by section 14—2(a). The majority contends that *People v. Dixon* (1961), 22 Ill. 2d 513, was not overruled by *People v. Kurth* (1966), 34 Ill. 2d 387. The court goes on to say that the decision in *Kurth* "turned on

the holding that even though the device had been installed by one of the parties to the conversation, another party was not precluded from having the conversation excluded from evidence." (88 Ill. 2d at 363.) The majority concluded that "[t]he court overruled *Dixon* only with respect to that issue." (88 Ill. 2d at 363. See 34 Ill. 2d 387, 395.) But to that extent *Dixon was overruled,* and that is precisely what is at issue here. The defendant did not have knowledge and did not consent. Recordings of this conversation would clearly be inadmissible against the defendant. So too should the conversations as repeated by the police officer.

A person commits eavesdropping when he uses an eavesdropping device to hear or record any part of a conversation (Ill. Rev. Stat. 1977, ch. 38, par. 14—2). The term "eavesdropping device" is defined by section 14—1(a) of the Criminal Code of 1961 as "*** *any device capable of being used to hear* or record oral conversation whether such conversation is conducted in person, *by telephone,* or by any other means ***." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 38, par. 14—1(a).) This does not include hearing-aid devices used to help the hard-of-hearing (Ill. Rev. Stat. 1977, ch. 38, par. 14—1(a)). When an extension telephone is used for the sole purpose of surreptitiously overhearing the conversation of two parties, then it becomes an eaves-dropping device even though one party may have con-sented. In *People v. Perez* (1968), 92 Ill. App. 2d 366, the police attached an aparatus to the earphone of a telephone to secretly overhear and record the conversation. This apparatus enabled others in the room to listen undetected to both sides of the conversation. The court considered this an eavesdropping device. There is no logical distinction be-tween the apparatus in *Perez* and the extension telephone here, when one considers the manner in which the phone is being used. The application of this statute should not turn on the type of equipment utilized. The privacy of a telephone conversation was invaded without proper auth-

ority in a manner offensive to the language of section 14—2. Officer Dwyer used the extension telephone for only one purpose; to overhear the telephone conversation of the defendant without detection.

In *United States v. Harpel* (10th Cir. 1974), 493 F.2d 346, 350, the court noted that "[i]t is the means whereby the contents of the conversation are acquired that is crucial." The majority is correct in pointing out the differences between the Federal statute as construed in *Harpel* (18 U.S.C. §§ 2510 to 2520 (1970)) and the Illinois statute. However, the *Harpel* court's rationale is sound. The court in *Harpel* refuted the contention that the use of an extension telephone does not violate the Federal eavesdropping statute. (493 F.2d 346, 351.) The court said that the use of an extension telephone, with the consent of one party, to overhear a conversation does not violate Federal law. However, when the extension telephone is being used to overhear a conversation without any consent, then a violation does occur. It becomes apparent, then, that an extension telephone, when used to surreptitiously overhear a conversation, is an eavesdropping device, and statutory requirements regulating the use of such devices must be complied with.

The Pennsylvania Supreme Court in *Commonwealth v. Murray* (1966), 423 Penn. 37, 223 A.2d 102, indicated that, while in a majority of instances an extension telephone is not an eavesdropping device, "[i]t is not what the telephone extension *is* that may make it illegal in certain circumstances, but the *use* to which it is put." (423 Penn. 37, 50, 223 A.2d 102, 109.) The commonplaceness of the device is not the criterion for determining the criminality of its employment. (423 Penn. 37, 50, 223 A.2d 102, 109.) See *Campiti v. Walonis* (1st Cir. 1979), 611 F.2d 387 (an extension telephone used to monitor conversations of prison inmates is an intercepting device).

The officer's testimony concerning the defendant's conversation was tainted, since it was the product of

unlawful eavesdropping. The contents of that conversation should have been suppressed. If the conversation resulted in the discovery of the gun, it too should have been suppressed. Any product of such eavesdropping is excludable as a "fruit of the poisonous tree." (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *Costello v. United States* (1961), 365 U.S. 265, 5 L. Ed. 2d 551, 81 S. Ct. 534.) Any information obtained in violation of the eavesdropping statute is not admissible. (Ill. Rev. Stat. 1977, ch. 38, par. 14—5.) This applies both to primary evidence (the conversation) and any derivative evidence acquired as a logical consequence of the officer's unlawful eavesdropping.

JUSTICE SIMON, also dissenting:

I concur in the dissenting opinion of Justice Clark and, for the reasons stated in that dissent, I think the defendant should receive a new trial. I also dissent for the reasons stated in my dissent in *People v. Lewis* (1981), 88 Ill. 2d 129.

I would like to add the following observations to Justice Clark's dissent. Although Officer Dwyer had the consent of the defendant's mother to overhear her conversation with her son, it is not clear from the record that Michael Gaines consented to Officer Dwyer listening in when he talked with the defendant. In addition, the fact that the police may already have had information pointing to the defendant's complicity does not justify Officer Dwyer's testimony which related the statements by the defendant to his mother and brother. Those statements are set forth in the majority opinion. They are clearly self-incriminatory, and Officer Dwyer's testimony about them was inadmissible because of the eavesdropping statute.